Charles James REEVES, Appellant,

v.

**WARDEN, MARYLAND PENITEN-
TIARY, Appellee.**

No. 9435.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 16, 1964.

Decided Feb. 25, 1965.

Rehearing Denied July 23, 1965.

Morton P. Fisher, Jr., Baltimore, Md. (Court-assigned counsel), for appellant.

Franklin Goldstein, Asst. Atty. Gen. of Maryland (Thomas B. Finan, Atty. Gen. of Maryland, on brief), for appellee.

Before SOBELOFF, Chief Judge, and BOREMAN and J. SPENCER BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge.

The petitioner, Charles James Reeves, has appealed from the district court's denial of his petition for a writ of habeas corpus after a full evidentiary hearing.[1] Reeves maintains that his constitutional rights were abridged in his state court trial in several respects, but his principal contention is that a yellow note was seized by the police during an unconstitutional search and admitted in evidence against him to his prejudice.[2]

The basic facts in this case are extensive, but they are not in serious dispute. On the evening of July 23, 1959, at about 11:30, the prosecutrix, Miss Nancy Austin, a white single female, then nineteen years old, was raped at her apartment in Baltimore, Maryland, where she was living alone. She testified that she discovered her attacker in her apartment as she came from her bathroom to her bedroom and that he held a broken half-pint vodka bottle to her throat while he raped her three times. After about forty-five minutes she managed to escape from him, and as she ran out of her apartment and down the stairs, her assailant threw the broken bottle at her. The bottle broke into a number of smaller pieces when it missed her and struck a wall instead.

The matter was promptly reported to the Baltimore police,[3] who immediately investigated the scene of the crime and questioned Miss Austin. A description by the prosecutrix of her attacker was subsequently broadcast to all police units on duty. The next day Miss Austin was shown pictures of eight Negro males, each of whom had some form of mustache. From this group she identified the petitioner as her assailant. The grouping was prepared in order to test her reaction to the petitioner's picture because Officer Ford, one of the several officers who were investigating this offense, thought that the physical description of her attacker given to the police by the prosecutrix—his race, height, weight, hair and complexion coloring, and the existence of a mustache—generally matched that of Reeves. Officer Ford was familiar with Reeves because he had arrested him in May, 1958, and charged him with the burglary of an apartment in the neighborhood where Miss Austin lived. Reeves was subsequently convicted of burglary and received a prison sentence of one year.[4] In that proceeding the prosecutrix, also

---

1. The opinion of the district court is reported at 226 F. Supp. 953 (D. Md.1964).

2. The other constitutional claims asserted by the petitioner are (1) that he was illegally arrested and thus a damaging statement attributed to him by the police at his trial was inadmissible, (2) that his representation by counsel at the state court trial was so inadequate as to amount to a denial of due process, (3) that evidence exculpatory to him was not disclosed by the state prior to or at his trial, and (4) that the evidence introduced against him was so insufficient that his conviction based upon it denied him due process. We do not find it necessary in our disposition of this case to pass upon these contentions.

3. The prosecutrix was examined by a police department examining physician, Dr. Irvin P. Klemkowski, approximately three hours after the rape. His examination revealed "a scant discharge" of semen in the vagina but no contusions, larcerations, abrasions or bleeding of the genitalia or any other part of her body. On the basis of this examination, he testified that "a recent penetration had occurred," and he defined "recent" as within ten hours of his examination.

4. The petitioner denied committing the burglary. He testified that he was then

a young white woman, testified that a Negro intruder had forced his way into her apartment and had ordered her to lie on her bed and say nothing while he held a fishing knife at her throat, but there was no charge that she had been raped or otherwise physically molested.

Although Miss Austin's identification of the petitioner was made before 11:00 on the morning of July 24th, not until more than twelve hours later did the police make any effort to apprehend Reeves, and he was not arrested until about 5:45 on the morning of July 25th, more than eighteen hours after the identification. Despite this lapse of time, no arrest warrant was procured.[5] As the several police officers who had been directed by Captain Mahrer to pick up Reeves [6] arrived at 2527 West Fairmount Avenue, where the petitioner was living with his older sister (who owned the house), his mother, and a niece, they met the sister, Dovie Joyner, who was just returning home, and she admitted the officers to the house [7] and directed them to the middle room where the petitioner was sleeping. Reeves was awak-

ened by Lt. Klump and told to get dressed because the police wanted to talk with him downtown. Lt. Klump testified that no charge was made against Reeves at this time and that he was advised only that he was being taken in for investigation and interrogation. A specific question to the police by Reeves' mother asking why they wanted her son received only an unresponsive reply.[8] At the time of the arrest, the police did not make a careful search of the premises. They did, however, take with them some of the petitioner's clothing which was lying on a chair in his room, but no evidence based upon or derived from this clothing was introduced at his trial.

Reeves was placed unhandcuffed in a police car with several officers to be taken downtown. During this trip, he allegedly made a totally unsolicited statement to the officers that "if I had known you fellows were out there, you would never have got me, I would have went over the roof top." [9] Upon his arrival at the police station house, Reeves was booked for investigation. The arrest blotter shows that he was subsequently charged

---

sixteen years old and that he had acted only as a lookout for the person who actually entered the victim's apartment. This alleged accomplice was never located by the police. At the habeas hearing Reeves testified that "Officer Ford told me [then] that I got away that time but he'd take care of me the next time * * *." Later he explained the use of the phrase "got away" when he in fact received a one year prison sentence by the statement that "I think he [Officer Ford] wanted me to have more [time in prison] than that."

5. The police testified that arrests such as this were often made during the night to minimize the chance of warning and escape.

6. The number of officers involved on this assignment is a matter of dispute. The petitioner contends that there were five officers present when he was arrested— Lt. Klump, Sgt. Shaffer, and Officers Ford, Glover, and Lesnick. The police arrest register lists all five of these policemen as arresting officers. The state in its brief only concedes the presence of

Klump, Shaffer, and Ford in the arresting group.

7. The consent to entry into the house is also a matter of some dispute. The sister testified at the habeas·hearing below that the officers came in behind her without asking her for permission to enter. The district judge found that Mrs. Joyner admitted the officers to the house at the time Reeves was arrested.

8. One of the policemen told the petitioner's mother to ask him, that he would know why, and that "if he wants you to know, he will tell you."

9. This statement, which will be referred to further hereinafter, later proved to be a very damaging piece of evidence against the petitioner, in spite of his repeated denials that he ever made it. The trial judge credited the testimony of the police officers that Reeves made this statement, and in his oral opinion at the conclusion of the state court proceedings, he said of it: "That is a strong evidence of a guilty conscience."

with rape and burglary in separate counts.[10]

On the morning of July 26th, the prosecutrix identified Reeves as her assailant a second time by picking him out of a police lineup. She later confirmed her identification upon closer examination by means of a skin rash on the right side of his face and neck which she said she had noticed at the time of the crime.

■ In spite of careful police work, no evidence was unearthed to tie the defendant to the crime except the prosecutrix's identifications, the yellow paper in issue here, and the statement allegedly made by the accused as he was being taken to police headquarters.[11] Paint scrapings, fingerprints, and palm prints from the apartment and the bottle fragments were sent to the F.B.I. laboratories along with the defendant's fingerprints and the clothes taken from his room at the time of his arrest, but all tests were negative.[12] The defendant produced seven alibi witnesses who testified that of their own knowledge they could state that Reeves was in his own neigh-

borhood at or about the time of the crime, and he himself took the stand and denied his guilt.

The prosecutor opened the one day trial[13] before the Criminal Court of Baltimore City, sitting without a jury, with a trenchant description of a rape so wanton and brutal that he felt it justified asking for the death penalty. In his preview of the testimony which he expected to offer, the prosecutor said:

"We also anticipate probably a great cavalcade of alibi witnesses who will be produced by the Defense but there is one other item which we want to introduce in evidence. That when the police went to the home of Charles James Reeves and picked him up, at this time he had no idea of what he was being questioned about, what he was charged with, on what day, if any offense was involved, and yet at the time they picked him up they conducted a search of his room and his bureau with his clothing which almost all of which had been freshly laundered, they found under a shirt

10. The circumstances surrounding the burglary charge are extremely mysterious. No police officer could shed any light on this matter. The report of the arresting officers made on the night of the crime contained no reference to burglary. Lt. Klump testified that he had never heard about anything being stolen in connection with this case, and no stolen goods were ever recovered. The burglary charge was stetted on the day Reeves was sentenced for the rape conviction.

11. We find it unnecessary to reach the question of the legality of Reeves' arrest, since we accept the district judge's finding that the subsequent statement was "a voluntary comment made by petitioner." As such, it was admissible against him under Maryland law. Hitt v. State, 235 Md. 544, 201 A.2d 771, 772 (1964); Peal v. State, 232 Md. 329, 193 A.2d 53, 55 (1963); Stewart v. State, 232 Md. 318, 193 A.2d 40, 43–44 (1963); Prescoe v. State, 231 Md. 486, 191 A.2d 226, 230–231 (1963).

12. These laboratory tests form the basis for one of petitioner's claims that his constitutional rights were violated be-

cause of his allegation that the state failed to disclose evidence exculpatory to him. The state requested that sperm and spectographic tests be performed on Reeves' clothing prior to trial, but Reeves' counsel did not learn of these requests or of the results of the tests until the hearing below on the habeas petition. Nor was the state, either at the original trial or at the habeas hearing, able to produce the broken pieces of the vodka bottle. The record before us contains a photograph of bottle fragments, but this picture was not in evidence at the state court trial.

13. The length of the trial is significant because of petitioner's criticism of his counsel's failure to object to the admission of the yellow note. Mr. Maurice T. Siegel, the attorney who represented Reeves in the state court proceedings, testified at the habeas hearing that he did not know of the existence of the note before the trial. He thus had not talked with anyone about it and had no opportunity to reflect upon its admissibility or its significance.

in his bureau drawer a yellow slip of paper. A yellow slip of paper saying Thursday, Thursday was the date of this rape, and outlining the, it looks like a schedule in full detail [of] the whereabouts on that day, six to six-thirty, cleaning kitchen, 6:30 to 6:45 watch television, et cetera, met Paul, and with no other day but on this day and this day alone attempting to outline his movement[s] virtually minute by minute, certainly every half hour by half hour, and on the basis of that and of course primarily upon the positive identification of the young lady, * * * we think the State will prove beyond all reasonable doubt that this Defendant, Charles James Reeves is guilty of rape, a brutal, violent rape and threat to her life upon the complaining witness, the 18 year old Nancy Austin, and for those reasons when the Court hears all of the evidence we feel it will be justified both in bringing in a verdict of guilty and imposing in this case the supreme penalty, the death penalty." [14]

The trial court found the defendant guilty of rape, and five months and one week later, Reeves was sentenced to life imprisonment. In an informal oral opinion rendered at the conclusion of the trial proceedings, Judge Byrnes, without purporting to exhaustively summarize all the evidence in the case, commented upon some of the items which he found particularly persuasive. He referred specifically to the prosecutrix's positive identifications of the accused and to the statement by Reeves in the police car about "going over the roof." [15] Although it had been offered by the state and admit-ted without objection, Judge Byrnes did not mention the yellow note.

A motion by Reeves for a new trial was denied on April 2, 1960, and his conviction was affirmed on appeal. Reeves v. State, 224 Md. 436, 168 A.2d 353, cert. denied, 368 U.S. 865, 82 S.Ct. 113, 7 L.Ed.2d 62 (1961). An appropriate petition for relief under the Maryland Post Conviction Procedure Act was filed on December 6, 1961, and denied on November 5, 1962. Leave to appeal from this decision was denied by the Maryland Court of Appeals on March 13, 1963. Reeves v. Warden, 231 Md. 613, 188 A.2d 698 (1963). Having thus exhausted his available state remedies for redress, Reeves filed his petition for a writ of habeas corpus with the federal court on April 3, 1963. Judge Thomsen's order denying the habeas petition was filed March 5, 1964.

We have stated earlier that the principal claim asserted in behalf of the petitioner is that he was prejudiced by the admission at his trial of an unconstitutionally seized document. The resolution of this issue involves at least three subsidiary questions: (a) Is it reasonably possible that the admission of the yellow note prejudiced the petitioner? (b) If so, under the circumstances of this case, were the police engaged in an unreasonable search when, without a search warrant, they searched the dwelling where the defendant lived and discovered the yellow note among his personal belongings in a bureau in his room? and (c) Assuming affirmative answers to questions (a) and (b), did the failure of defendant's counsel to object to the admission of the note when it was offered at the state court trial constitute a waiver of any constitutional contentions which

14. This statement contains two errors: (1) the search of the petitioner's bureau which uncovered the yellow note occurred not at the time he was arrested but two days later on July 27th, and (2) Miss Austin was ninteen rather than eighteen years old at the time of the rape.

15. Judge Byrnes also indicated some of the testimony with which he was not im-pressed. He discredited the testimony of the defendant's alibi witnesses with this observation: "I do not say that all of these witnesses are lying. I think some could be mistaken. I think, however, some were lying and I think that their stories were in some conflict and others were a bit too pat."

might have been raised? We proceed to a seriatim discussion of these three inquiries.

### I.

#### Prejudice From the Introduction of the Note

█ The standard which must govern our decision on the question of whether the introduction of the note was prejudicial to the defendant is set forth in Fahy v. State of Connecticut, 375 U.S. 85, 86, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963):

"We are not concerned * * * with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." See also United States v. Boyce, 340 F.2d 418 (4 Cir. 1964).

The question which we must answer is not an easy one because of the unusual nature of the note's contents and the circumstances under which it was admitted at the trial. The text of the yellow note read as follows:

"helped wash
cleaned kitchen
Scrubbed
took bath
looked at Zorro
went on front steps
Thursday

— — — — — —

helped wash 9–2
cleaned kitchen 2–4:30
looked at Edge of Night
scrubbed floor 5–5:30
took bath 5:30–6:30

read 6:30–8
looked at Zorro 8–8:30
went on front 8:30–  ."

As pointed out so cogently by the state court prosecutor in his opening statement, if this memorandum was prepared by or for the accused prior to his arrest on the morning of July 25th, then it would be a strong if not overpowering indication of his guilt, for why else would he prepare a schedule of his activities solely for the day of the crime except for use as an alibi? The state here vigorously asserts that the note could not have been prejudicial to the defendant because the last time noted on it was more than three hours prior to the time when the offense was committed, thus preventing it from being an effective alibi and arguably destroying any unfavorable inference which could be drawn from it, even if it were conceded that the petitioner prepared it. The answer to this argument, however, is that the failure of the times to overlap would not destroy the inference that an alibi was in preparation, because it could be forcefully argued that the work of preparing the alibi was interrupted before it could be completed. The fact that it was found not when Reeves was arrested but two days later did not eliminate the possibility (or even make it less likely) that the note was prepared by or for the accused before his arrest, because only a cursory search of the defendant's room was made at the time of his arrest and no thorough search of the entire premises took place until July 27th, when the note was found. The fact that no proof of handwriting was offered to tie the note to the defendant did not strip the document of its potential poison, for it would have been just as damaging if it had been prepared by someone at Reeves' direction as if he himself had written it.[16] After

16. The record of the habeas hearing discloses that the handwriting was not checked prior to the trial because the petitioner would not give the police sufficient samples of his handwriting to enable them to make a proper comparison. The petitioner was not cross-examined on this point when he took the stand at his trial. Subsequent handwriting tests were inconclusive. Much is made of the fact that petitioner's counsel did not have him expressly deny writing the memorandum when he testified at his trial. However, this cuts two ways. If in fact he did write it, there could of course be no denial. Even if he did not personally pre-

all is said, if this memo was prepared before Reeves was arrested, it pointed the finger of guilt straight at him. Not the contents of the note, or even its authorship, but *its existence, secreted among Reeves' possessions in his room,* made the note important and at the same time potentially harmful to him.

The effect of a particular piece of evidence can be influenced not only by its contents but also by the extrinsic circumstances surrounding it and the manner in which it is offered in evidence. Let us examine the manner of the introduction of the yellow note. Officer Ford took the stand and testified as follows:

"DIRECT EXAMINATION

"By Mr. Moylan:

"Q. Sergeant [formerly Officer] Ford, I direct your attention to about 5:45 a. m. on July 25th of this year. Did you have occasion to go to 2527 West Fairmount Avenue? A. I did. Your Honor, I did, at 5:45 a. m. on the 25th of July in company with Lieutenant Klump, Sergeant Shaffer, we proceeded to 2527 W. Fairmount Avenue which is the home of Charles Reeves, this young man right here in the blue sweater.

"Q. Indicating the Defendant. A. And we were admitted by his sister, Mrs. Joyner. We asked if Charles was at home. She stated that he was in bed, in the middle room. We proceeded to the middle room. Lieutenant Klump woke Charles up. The first thing Charles said [was] how did you get in here. We informed Charles that his sister admitted us.

"Q. (Mr. Moylan) And were you with him in the radio car when he was taken to the station? A. I was in the car and in the process of bringing him to Central District,

Charles made a statement that if he knew we were coming he would have went over the roof.

"Q. [Did] You at that time or any subsequent time, Sergeant, interrogate Charles Reeves about his whereabouts during the evening of July 23rd? A. No, I did not, at that time.

"Q. Did you at any subsequent time? A. No, I did not.

"Q. Sergeant, while you were in the apartment there at 2527 W. Fairmount, did you conduct a search of the premises? A. Yes, we did. We went into a bureau drawer which was the place in which Charles kept his clothes.

"Q. What did you find? A. In the second bureau [drawer] I found a little yellow paper.

"Q. Do you have that with you? A. No, I do not.

"Q. Do you know where it is? A. You had it the last I recall.

"(Mr. Siegel) Let me look at it.

"(Mr. Moylan) We are not offering it yet.

"A. That is it.

"Q. This is the piece of paper you recovered and where did you recover it from? A. From the second drawer from the top of the bureau among his underwear.

"Q. Among his underwear? A. That's correct, and the mother stated—

"Q. Wait a minute? A. His mother stated that his little sister wrote that on this paper.

"Q. This was at the time you picked him up originally, is that correct? A. No, that was not when we picked him up originally. That was on the 28th of July. When I went back and spoke to his mother.

pare the note, it would have been difficult, if not impossible, to disprove beyond doubt that it at least had been prepared

before his arrest at his request. In either event, any attention called to the note would have been dangerous.

"Q. You picked him up on the 25th? A. On the 25th, 5:45 a. m., July 25th, and we went back to the home on July 28th, approximately 8:30 a. m. and spoke to his mother, Mrs. Daisy Reeves. At that time we requested permission to go through his drawers and she gave us permission and that was discovered.

"Q. We will offer this as State's Exhibit No. 3.

"(The yellow piece of paper was offered in evidence and marked State's Exhibit No. 3)

"(Mr. Moylan) No further questions.

"CROSS EXAMINATION

"By Mr. Siegel:

"Q. Sergeant, this paper that Mr. Moylan has introduced in evidence, it was found in the home and in the bedroom of the defendant? A. That's correct, sir.

"Q. And the mother told you that the sister had written it down? A. That's correct, the little sister."

[The remainder of the cross-examination was not concerned with the yellow note.] [17]

■ The state argues on the basis of this testimony that "the judge in the Criminal Court, from the evidence before him, had to believe and did believe that the Appellant did not write the note * * *," because Officer Ford's hearsay statement about his conversation with Reeves' mother was the only evidence bearing on the note's authorship which was introduced.[18] We think, however, this testimony must be considered against the background of the prosecutor's opening statement. While we readily accept the state's assertions that this opening statement was not itself evidence and that it is unlikely that an experienced trial judge would have so taken it, we are not unmindful of the fact that an opening statement can and often does set the atmosphere at and for a trial. We think this is particularly true in cases where a capital crime is charged. We think a prosecutor who boldly asserts at trial that a particular piece of evidence will prove his charges and who subsequently introduces that evidence is under an obligation to correct the impression he may have created when later developments clearly show that his prior assertions regarding that piece of evidence were incorrect and misleading. Cf. Barbee v. Warden, 331 F.2d 842, 846 (4 Cir. 1964). The state's attorney in this case, by his own admission, never did anything affirmatively to withdraw or abandon the note after Officer Ford's testimony about its authorship, and we have no reason to assume or believe that he was not perfectly honorable about this matter. Indeed, the prosecutor stated at the habeas hearing below that notwithstanding the mother's statement testified to by Officer Ford, he believed both at the time of the trial and then (at the time of the hearing) that the petitioner had prepared the note in his own handwriting before he was arrested. In oral argument before us, the state has conceded that Mr. Moylan still adheres to his original belief.[19] It is not surprising, there-

17. Certain minor errors appear in Officer Ford's testimony. The "little sister" referred to was in fact the petitioner's niece, since she was his sister's daughter. Also, the Baltimore police records show that the search of Reeves' room and the discovery of the yellow note took place on the 27th of July rather than on the 28th and that the officers went to the house at approximately 11:15 a.m., not at 8:45 a.m.

18. "The fact that the prosecuting attorney in his opening statement inferred that the yellow note had been written by

Appellant still would not influence the trial judge when the only admissible testimony at the trial indicated that the mother had told the officer that the niece had written the note." Brief for Appellee, p. 16.

19. There was testimony at the habeas hearing which indicated that Officer Ford also doubted the mother's story about the note's authorship. In response to a question by Judge Thomsen asking why the note was taken from the Reeves house by the police officers *after the mother told them that the little girl*

fore, that the testimony in question discloses nothing which would offset the weight and importance ascribed to the note in the prosecutor's opening remarks and nothing which lends any emphasis to the mother's statement concerning who wrote the note.

As the state reminds us, however, what the prosecuting attorney thought about the note is not dispositive of the issue before us; the state of mind which is of crucial importance is that of the trial judge. Accordingly, our attention is directed to the fact that the district judge below concluded after a full consideration of the evidence that "the experienced and able trial judge was not misled in evaluating the evidence and reaching his conclusion." [20] We think, however, that the real question is not whether the state trial judge was *in fact* influenced by the note; rather, in the words of Fahy, it is "whether there is a *reasonable possibility* that the evidence complained of *might have contributed* to the conviction." (Emphasis added.) The state trial judge did not state whether or not he was influenced by the yellow note.[21] It is difficult enough for the very person who makes a decision to identify those things which influenced his mental processes; the difficulty is increased to the boundaries of impossibility when some other person attempts to state with certainty whether particular factual material influenced the decision-maker in arriving at the conclusion he reached.

Construing the conclusion of the district judge about the influence of the note to be a finding that there was not a reasonable possibility that the state trial judge might have been influenced unfavorably by it, we think on this record that such a finding is clearly erroneous, and it must therefore be set aside.[22]

Considering this record in light of the standard declared in Fahy, we think that

*had written it*, Ford stated: "Well, at that time we felt that * * * perhaps the boy, Reeves, might have wrote it himself." Ford also acknowledged that despite its potential importance and despite the fact that the little girl was there in the house at the time the note was discovered, he and Officer Lesnick made no inquiry and took no further action to settle the question of who had prepared this note. If these two law enforcement officers who were closely connected with the case believed that the defendant wrote the note, non obstante the mother's statement, how can we find that the trial judge was so impressed with this secondhand evidence that he would believe the mother's statement as relayed by the officer? This being true, the district court's finding of fact that the mother or niece wrote the note is wholly irrelevant. We are not here concerned with that evidential finding; we are concerned with the possible effect of the note, authorship unknown, upon the mind of the trial court. The gingerly manner in which both sides treated the note after it had been introduced—the subject was apparently dropped without further comment by either side—seems to us as likely to indicate its potential prejudice as its harmlessness.

20. 226 F.Supp. 953, 959 (D. Md.1964). Judge Thomsen's language is from a similar statement by the Maryland Court of Appeals which reached the same conclusion. Reeves v. State, 224 Md. 436, 438, 168 A.2d 353, 354 (1961).

21. Even if he had done so, this would only be a declaration of his judgment as to whether he had been consciously influenced, and it would not eliminate the possibility that he might have been unconsciously influenced by the evidence.

22. Judge Thomsen not only thought that the note was not prejudical to Reeves; in discussing possible reasons why his counsel did not object to the introduction of the note at the trial, he concluded that the note might have *helped* the petitioner because "it showed that the mother and the little girl recalled the petitioner's activities on the day of the rape to be the same as those testified to by the petitioner when he took the stand, and made it unnecessary to put the mother on the stand to prove those facts." 226 F.Supp. 953, 960 (D. Md. 1964). In view of the fact that the note failed to establish an effective alibi because the times set out on it did not overlap by more than three hours with the time of the crime, we are at a loss to understand the district judge's conclusion. Beyond pure speculation, we can ascertain no pressure upon Reeves to produce his mother as a witness at the original trial.

the question of whether the introduction of the yellow note was prejudicial to the defendant must be answered in the affirmative. This conclusion requires that we consider whether the search by the police which uncovered the note was in violation of the constitutional rights secured to Reeves by the Fourth Amendment and made applicable to the states by the Fourteenth Amendment.

## II.

### The Legality of the Search

On July 27th, two days after the petitioner's arrest, Officer Ford accompanied by Officer Lesnick returned to the Reeves' home at approximately 11 a. m. The petitioner's mother, who like the petitioner lived there as a tenant or guest of the sister and who apparently was alone in the home at this time, answered the knock of the two officers at the front door, and it was she to whom they addressed their request for permission to enter the house and make a search for some clothing. The officers did not have a search warrant. The mother admitted the officers and agreed to let them search for the clothing in which they were interested.[23] In the course of the search, Officer Ford went into the room where Reeves had been sleeping when he was arrested, and while looking through a chest located in that room, he found the yellow note previously discussed in the center drawer under Reeves' underwear. The note, along with several articles of clothing, was taken to police headquarters and turned over to officials there.[24]

It was conceded by all that the room in which Reeves was sleeping at the time of his arrest was *his* room and that it was regularly and exclusively occupied by him. The district court found as a fact that the bureau in which the note was found "was set aside exclusively for petitioner's use, even though she [the mother] washed his clothes and placed them in one of the drawers." The court found, however, that the yellow note belonged either to the mother or her granddaughter and not to the petitioner and that it had probably been placed in the petitioner's bureau by his mother. For these reasons, the district judge concluded that the mother could lawfully consent to the search for and the taking of the yellow paper. With this conclusion we disagree.[25]

Even assuming, as the district court found, that the mother's actions amounted to a grant of permission to enter and search the premises,[26] we think she was without authority to consent to

23. The state contends that the mother, Mrs. Daisy Reeves, voluntarily consented to the admission of the officers to the premises and their subsequent search. Mrs. Reeves' testimony on the admission point at the habeas hearing was that "I know he asked one time could he come in, and being the law, what was I to say but 'come in'." She also testified that she told the officers they could search the house because she was afraid and because Officer Ford told her he wanted to help her and that he did not believe that her son had committed the rape. The district court found from the evidence that Mrs. Reeves voluntarily consented to the admission and search. In view of our disposition of this case, we find it unnecessary to decide these issues.

24. No statement was ever prepared by the police officers and given to any member of the Reeves household which indicated the articles which had been taken to police headquarters. Officer Ford testi-

fied at the habeas hearing that the petitioner's mother gave them permission to take from the premises the articles in which they were interested. The mother testified at the same hearing that the officers never asked her whether they could take anything with them when they left. She stated specifically that she never knew that Officer Ford had taken the yellow note from the house. The district court found from the evidence before it that the mother consented to the removal by the police of petitioner's trousers and the yellow note. For the purpose of this appeal, we accept that finding of fact.

25. The district court finding was phrased in these words: "Petitioner's mother did have the right to authorize a search of any part of the chest or bureau which she used for her own purposes, e. g. as a repository for the yellow paper on which she and her granddaughter were making notes." 226 F. Supp. at 960.

26. See footnote 23.

the search of Reeves' room and the bureau in it by the officers and that the petitioner has standing to challenge that search and the seizures which resulted from it. Jones v. United States, 362 U.S. 257, 265–266, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Holzhey v. United States, 223 F.2d 823, 825–826 (5 Cir. 1955); United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019, 1021 (1951). Under the circumstances in this case, with the room in question and the bureau in it having been set aside exclusively for his regular use, only the petitioner could give constitutionally effective permission for their search without a warrant.[27]

We think the district court ruling regarding the note found during the search of the bureau was contrary to the decision it reached in United States v. Rees, 193 F. Supp. 849 (D. Md.1961), a case involving circumstances similar in some respects to those in this case. There the defendant, without his parents' knowledge, concealed a locked accordian case in the attic of a house owned and occupied by his father and mother. The area where the case was stored was not devoted exclusively to the son's use, and although he had a key to their house, he was only an occasional guest of his parents. In the course of investigating certain charges, the F.B.I. secured the consent of the parents to search their home. This search revealed the accordian case, and the agents asked the father's permission to open it. The father gave his permission, even though he disclaimed any knowledge of the existence of the case, its ownership, or its contents, and the case was forced open. Inside the officers discovered, among other things, a mass of printed material related to the crime they were investigating, including a

statement in the handwriting of the accused and some pictures of scantily clad women on which additions had been drawn. When the admissibility of the pictures and the written statement in evidence against the accused was raised at his trial, the district court excluded all the material by ruling that

"They were papers as to which he [the defendant] was entitled to the benefit of the Fourth Amendment, especially when considered in conjunction with the Fifth Amendment." (Citing Abel v. United States, 362 U.S. 217 [234–35], 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); Gouled v. United States, 255 U.S. 298 [309–11], 41 S.Ct. 261, 65 L.Ed. 647 (1921); and United States v. Guterma, 272 F.2d 344 (2 Cir. 1959)). 193 F. Supp. at 855.

If the documents in Rees were within the ambit of the Fourth Amendment's protection when they were stored in a place not exclusively used by the son and when he was only an infrequent guest in his parents' home, an even stronger case for the application of this constitutional guarantee is made out here where the note was in a place devoted exclusively to Reeves' personal use and where he was a regular resident of the dwelling which was searched.

If one person, even a member of the household, may on one occasion, without the knowledge or consent of the user, secrete a single object in one drawer of a bureau habitually and exclusively used by that person and thereby acquire the power to destroy the right of privacy secured to the user by the Fourth Amendment, then "the right of the people to be secure in their persons, houses, papers, and effects * * *" becomes an

27. The district court seems to have ruled that the mother's consent (assuming that she did consent) could not legitimize the search of Reeves' *room* and the seizure of certain articles of clothing belonging to him which were taken from it by the police. Judge Thomsen's conclusion on this point was stated in these words: "She [the mother] had no right to consent to the search for or the taking of the petitioner's clothing, which belonged to him and which could not have been instruments of or fruits of the crime." 226 F. Supp. at 960. However, this ruling was of little practical consequence, because the articles of clothing were neither offered as evidence by the state nor did they furnish a lead to any evidence which was offered against the accused at his trial.

illusory guarantee indeed.[28]   Cf. Stoner v. State of California, 376 U.S. 483, 488–490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). Counsel for the state has cited to us no authority which stands for the proposition stated hypothetically above, and we have found no case which so holds.

█  We conclude that the search of Reeves' room and bureau was in violation of the Fourth Amendment, and the prejudicial yellow note which was the fruit thereof was therefore constitutionally objectionable.   Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).  We turn finally to the question of whether this constitutional objection was waived by the failure of Reeves' counsel to object to the introduction of the yellow note at his state court trial.

### III.

### Waiver From Failure to Object

It is not disputed that the yellow note was received in evidence at Reeves' trial before Judge Byrnes without an objection by his counsel, and the testimony heretofore set out in this opinion shows that Officer Ford was even briefly cross-examined about this note after the state proffered it as evidence.  Because of these two facts, the state has asserted that any objection to the note, constitutional or otherwise, which Reeves might previously have had is no longer available to him.

In its presentation both here and in the lower court, the state suggested that irrespective of any objection founded upon a claim of an unreasonable search and seizure, the yellow note, by a timely objection, could have been excluded as irrelevant because, so the argument goes, at the time it was offered, no evidence had been introduced which showed that the petitioner had written the note or tied it to him in any other way.  Thus it appears that all parties realize that the resolution of the waiver question really requires that we consider whether Reeves' counsel waived *two separate objections*, one based upon relevancy and the other based upon an abridgment of the petitioner's constitutional rights. Although it did not speak specifically in terms of waiver, we think the district court held in substance that Reeves must be treated as having waived *all* objections to the admission of the yellow note. Its ruling was stated in these words:

"Moreover, petitioner cannot now object because the paper was admitted in evidence, even if it had been illegally seized.  Quite apart from the rule announced by the Supreme Court in Mapp v. Ohio, the paper could not have been admitted in evidence if petitioner's counsel had objected to it, because there was nothing to indicate that petitioner had written it or that any other ground existed for its admission over objection."  226 F. Supp. at 960.

The Supreme Court has clearly and concisely stated the standard to be applied by the federal courts in determining the waiver of rights by habeas applicants—"an intentional relinquishment or abandonment of a known right or privilege."  Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

We can say first that while we question the soundness of the state's contention and the district court's finding that the note could have been successfully objected to on the *ground of relevancy*,[29] we

---

**28.** We point out that, although silent on this specific point, Judge Thomsen's finding that either the mother or the niece wrote the note and placed it in the bureau drawer is inconsistent with any knowledge of or consent by Reeves to the use of his bureau for the purpose of storing the note, since testimony credited by the court below was to the effect that the note was prepared in response to a suggestion to the mother by police officers made at least after the petitioner had been arrested and probably even after he had been jailed.  See 226 F. Supp. at 958.

**29.** The fact that this note was discovered concealed beneath *his* underclothing in a bureau used exclusively by *him* which was located in a room occupied solely by *him* and that it purported to describe *his* activities on the day in question

find it unnecessary to pass upon the question of whether Reeves waived that basis for an objection to the note. This is so because we think that under the special circumstances which existed in this case, there was clearly no waiver by Reeves of his objection to the note on the *constitutional ground*.

Reeves' trial before the Baltimore Criminal Court was held prior to the Supreme Court decision in Mapp v. Ohio, supra, and this court's decision in Hall v. Warden, 313 F.2d 483, cert. denied sub nom. Pepersack v. Hall, 374 U.S. 809, 83 S.Ct. 1693, 10 L.Ed.2d 1032 (1963), making Mapp applicable retroactively. At the time of the original state court proceedings, the Maryland law permitted the admission of evidence procured during the investigation of a felony in spite of the fact that it had been seized in the course of a constitutionally impermissible search.[30] Thus an objection by Reeves' counsel to the admissibility of the yellow note as the fruit of an unreasonable search would have been a futile and fruitless act, for it would have been summarily overruled. Not only would such an objection have been poor trial tactics, but it might have even resulted in a lecture from the presiding judge on the basic rules of evidence. See Hall v. Warden, 313 F.2d at 492. The only possible purpose such an objection could have served would have been to preserve this federal constitutional point in the event that sometime in the future the Supreme Court overruled its decision in Wolf v. People of State of Colorado, 338 U.S. 25, 33, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), and made the practical equivalent of the federal exclusionary rule enunciated in Weeks v. United States, 232 U.S. 383, 393, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914), binding upon the states (as it subsequently did in Mapp).

In view of the repeated Supreme Court admonition that the waiver of constitutional guarantees is not to be either presumed or lightly imputed to one charged with a crime, we think it would be unreasonable indeed to find a waiver here where Reeves' counsel merely acted in accordance with the accepted Maryland practice. Thus the special circumstance needed to obviate the necessity of objecting in order to preserve this point existed in the state rule of evidence then prevailing.

■ Stating the issue involved here in terms of the words used in Johnson even more clearly dictates the result we reach —it is the considered choice to relinquish or abandon a *known* right or privilege which constitutes waiver, and here, obviously, the right to have the yellow note excluded because its introduction would violate the Fourth Amendment was not a known right because it was not then recognized under Maryland practice.

For these reasons, then, we reject any notion that the failure of Reeves' counsel to object to the admissibility of the note at his trial is fatal to his cause and precludes him from objecting now to the violation of his constitutional rights which occurred.

## IV.

■ For the State of Maryland to retry the petitioner for the crime with which he was charged will concededly involve some expense and inconvenience. Balanced against that inconvenience and expense, however, are not only the sentence of life imprisonment which the defendant is currently serving but also the need for all people and groups—the courts, the police, and the general public —to be always vigilant to insure that the fundamental safeguards of liberty and due process embodied in our Constitution are *respected* as well as defended. If the right to a fair trial is to mean anything, it must include a trial free from constitutionally proscribed evi-

---

would seem to us a sufficient connection of the note with the petitioner to sustain its admission without error even over an objection based on relevancy.

30. See Hall v. Warden, 201 F. Supp. 639, 642 (D. Md.1962), for Maryland judicial and statutory authority supporting this proposition.

dence. Such a trial was not afforded Charles James Reeves.

Accordingly, the judgment of the district court is reversed, and the case is remanded with instructions to enter an order directing that the prisoner be either retried within a reasonable time or released.

Reversed and remanded.