**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jerry M. HUGHES and David Hoyle,
Defendants-Appellants.**

**No. 29041.**

United States Court of Appeals,
Fifth Circuit.

April 6, 1971.

Rehearing Denied April 28, 1971.

John M. Anderson, Fort Worth, Tex., for David Hoyle.

Stephen D. Susman, Houston, Tex., court appointed for Jerry M. Hughes.

W. E. Smith, Asst. U. S. Atty., Eldon B. Mahon, U. S. Atty., Fort Worth, Tex., for plaintiff-appellee.

Before JONES, GEWIN and CLARK, Circuit Judges.

GEWIN, Circuit Judge:

Each of the appellants Jerry M. Hughes and David Hoyle was arrested, indicted, tried by jury and found guilty on three counts of printing counterfeit obligations, possessing counterfeit plates and negatives, and possessing counterfeit federal reserve notes in violation of 18 U.S.C. §§ 471, 472, and 474. They contend on appeal that evidence introduced at the trial was obtained as a result of an illegal search and is, therefore, inadmissible. The evidence complained of includes: a printing press; approximately $250,000 in partially completed counterfeit twenty dollar notes; $30,000 in completed counterfeit $20.00 notes; counterfeit plates; sundry other implements of the printer's trade; two sawed-off shotguns; and a pistol. In addition they object to the admission of the three weapons on the independent ground that they were prejudicial evidence of another crime. Finding no merit in either of these contentions, we affirm the judgment of conviction in all respects.

The factual background presents a rather bizarre picture. Most of the above mentioned items of evidence were taken from a locked room in a seven room brick house located on a 19 acre tract of land not far from Mansfield, Texas. The house was owned by Mrs. Anna Bell Egger, a 45 year old divorcee, and occupied by Mrs. Egger and her 21 year old son, Glevis Egger.

Mrs. Egger and the appellant Hughes met during August of 1967 in a "lounge" operated by Hughes in Grand Prairie, Texas. They began "going together" and eventually became intimate. Hughes, who was himself married, lived with Mrs. Egger in her house for several of the months prior to his arrest on March 29, 1969. Meanwhile, the tempestuous and often hostile amorous interests of Hughes in Mrs. Egger expanded into business interests. In December, 1968, the couple opened up the College Bar and Cafe, a Fort Worth lounge licensed in the name of and partially financed by Mrs. Egger.[1] It was at this bar that Mrs. Egger first met the appellant Hoyle and it was there that Hughes and Hoyle designed and planned their counterfeiting scheme.

In early February of 1969, Mrs. Egger, who was then unaware of the scheme, told Hughes of "a dream about this counterfeit stuff." Dumbfounded, Hughes then showed her a picture of a $10 bill printed on the back of an old menu. At closing time three nights later appellants showed an apparent concern for the security of their secret. We quote from the direct examination of Mrs. Egger by the prosecuting attorney:

Q. All right. What was said at this incident, just tell us?

A. [Mrs. Egger] Jerry [Hughes] wanted to know if I told somebody about that picture.

Q. What picture are you talking about?

A. The $10 picture, and I said "No".

Q. All right.

A. And he said, "I think you have told someone." And I had not told anyone. And then he and David [Hoyle] said they were going to take me to the lake for a ride.

Q. All right. What happened then?

A. So we closed the place and went out to the car, and they [Hughes and Hoyle] had to put me in the car.

\* \* \* \* \* \*

Q. All right. Now, did you object to going with them on that occasion?

A. I said, "I am not going to the lake to be killed."

Q. What did they say?

A. They said, "we are taking you to the lake for a ride."

\* \* \* \* \* \*

Q. All right. What happened after you were put in the car?

---

1. The license was revoked on March 22, 1969, when it was discovered that Mrs. Egger had failed to disclose Hughes' proprietary interest in the establishment.

A. We drove to Lake Arlington and we come to one of those roads that leads to a ramp where you can unload a boat. And all the way up there I had been punching Jerry [Hughes] and asking, "How can you think of this?" And there wasn't too much talking on the way out, and I started crying. And so we got out there, well, Jerry said, "what are you punching me for?" And so they got out of the car and went around to the back to talk about it. And then—

\* \* \* \* \* \*

A. And then Jerry comes back. And he had a pistol on the steering column of his car, and he got that and he just says, "You were looking at that, wasn't you?" And I was looking at it. So then they came over and got back in the car and we drove to my house and all three spent the night at my house that night.

■ Soon afterwards, a printing press appeared on the front porch of Mrs. Egger's house. A few days later, on February 7, it was moved inside, without objection, to a room adjoining Mrs. Egger's bedroom. The only access to this room was through this bedroom. The following morning Hughes added a padlock, taken from Mrs. Egger's boat, to the door of the "press room". When he asked her for the only key to this lock, she gave it to him; and when he de-manded that her son Glevis be told to move out of the house, she acquiesced,[2] but testified that she was afraid to disobey the commands of Hughes.

■ Then, on the night of February 10, the day following Glevis' expulsion, Mrs. Egger was seriously beaten by Hughes. In self-defense and retaliation, she moved out of her house to stay with friends, and went immediately to the local police department to report appellants' planned counterfeiting activities and to seek help. The following morning she called the FBI and was referred to the Secret Service, to whom she promptly went and again told her story. The somewhat incredulous secret service agents agreed to go with her to see the counterfeiting apparatus at the house. Finding the press room padlocked as usual, they entered the room through an outside window known by Mrs. Egger to be unlocked.[3] The press was situated in plain view in the center of the room. The agents observed it, scratched their initials on it in an inconspicuous place and left through the window. No evidence was seized at this time.

■ No immediate action was taken to arrest appellants because it was apparent from the scene that the crime of counterfeiting had not yet been committed. It was decided that the house would be kept under surveillance until, with the help of information from Mrs. Egger, it was determined that actual

2. Glevis moved out on February 9. In accordance with previous discussions with appellants, Mrs. Egger gave as a reason for asking him to leave that she was going to rent the house out. The trial judge found, and we agree, that there was never a rental agreement of any nature between Mrs. Egger and either appellant.

3. She told the agents that she owned and occupied the house and that she had decided to move out after being beaten by Hughes. She related her story in meticulously accurate detail and was obviously familiar with the house. There was no one else present at the house during the first search. This alone is arguably enough to justify the officers' reliance on her consent to search the house.

Because she had apparent authority to consent, an officer relying on her consent to conduct a search would not be acting unreasonably. See ALI, Model Code of Pre-Arraignment Procedure, Part II: Search and Seizure, §§ 4.02(1) (c), 8.02 (1) (b) (iii) (Tent.Draft No. 3, 1970) and accompanying notes and comments. But see, e.g., Stoner v. California, 376 U.S. 483, 486, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Reeves v. Warden, Maryland Penitentiary, 346 F.2d 915 (4th Cir. 1965). In addition to Mrs. Egger's assurances of ownership of the premises at the time she requested the officers to enter the house, the record clearly demonstrates that she was in fact the owner of the premises.

counterfeiting had taken place. It was agreed that Mrs. Egger would not be prosecuted. On February 12 Mrs. Egger executed a written "statement", reciting that she owned the house and had not given permission for any illegal activity to be conducted therein; it granted the Secret Service authority "to search the premises of my residence including every room in the dwelling house * * * in either the day time or in the nighttime or whenever the officers see fit so long as they are assisting me in putting a stop to the illegal activity which is taking place or about to take place in or about my residence." There is no evidence whatsoever that Mrs. Egger did not willingly sign this consent.[4]

■ Mrs. Egger did not move back into her house until after March 22, 1969. There is nothing in the record to show that her return amounted to an acceptance of appellants' claimed control of the house or press room. Instead the move is associated with the revocation on March 22 of her license to do business. Moreover, neither appellant lived at the house; she was aware of and could take security in the protective surveillance of federal officers. This was her home, and she had a right to return there not only to protect it, but also to observe and report what was taking place. Her return in no way represented a reconciliation with appellants; it revoked neither her consent nor her authority over the press room.

The surveillance continued for over a month. Late in March, indications of upcoming counterfeiting activity arose. Both Hughes and Hoyle were repeatedly seen on the premises during the entire surveillance period.

Arrest warrants were obtained on March 27. During the night of March 28 the agents were in close proximity to the residence. Hughes and Hoyle were observed going in and out of the press room and the lights of the plate maker were seen going on and off, indicating that a plate was being made. The agents' suspicions that the counterfeiting took place over the night of March 28 were corroborated by a pre-arranged signal from Mrs. Egger the following morning. At about 9:30 on the morning of the 29th, Mrs. Egger left the house in her car followed by Hughes in his own car. Hughes was arrested as soon as he got well away from the house. Without announcing themselves, agents entered the house and arrested Hoyle with his wife in a back bedroom of the house.[5]

Relying on Mrs. Egger's oral and written consent, the agents searched the house. After forcing open the door to the locked press room, they discovered the counterfeit money, the counterfeit plates and printing accessories, and the printing press. Over objection, this evidence was admitted. The court found that they did not result from an unreasonable search in light of Mrs. Egger's valid consent.[6] In addition, two sawed-off shotguns and a pistol were found in the house. The pistol was found in a livingroom chair; one shotgun (wrapped with black tape) was found in the press room close to the press and partially concealed; the other shotgun (wrapped with silver tape) was found in a back bedroom. These guns and a picture taken by a secret service agent showing the shotgun in the press room were admitted into evidence as being part of the *res gestae* and as having a bearing upon the issue of intent.

---

4. We find no merit in appellant Hoyle's contention that evidence of the oral and written consents were improperly put before the jury. Similar consents have regularly gone into evidence in other cases as a matter of court. *E.g.*, Drummond v. United States, 350 F.2d 983, 986 (8th Cir. 1965). Proof of Mrs. Egger's consent was properly admitted to show that she did in fact authorize the search of her home.

5. Mrs. Hoyle was also indicted, but entered a plea of guilty.

6. The court also found that there was probable cause to justify the March 29 search. Because our finding of a valid consent is dispositive, we need not consider this finding.

## I

The Fourth Amendment, by its own terms, proscribes only "unreasonable" searches. Thus is required, under the facts of each case, a determination whether the search complained of was reasonable in all of the existing circumstances.[7] In making this determination the cases have recognized two distinct interests to be protected: the property rights of the person in possession of the searched premises,[8] and the personal rights of the individual against whom seized evidence is to be used.[9] The rule of this Circuit reflecting the former interest is that:

[W]here two persons have equal rights to the use or occupation of the premises, either may give consent to a search, and the evidence thus disclosed can be used against either.[10]

In recognition of the second, personal, right not to be frustrated in a "reasonable expectation of freedom from governmental intrusion"[11] into areas of "personal privacy" protected by the 4th and 5th Amendments,[12] this Circuit has established the rule that:

[W]here the search does not extend to a part of the premises rightfully in the exclusive control of one against whom the search is directed, the courts have upheld the validity of the search.[13]

Appellants vigorously argue that Mrs. Egger did not have authority to consent to either search of the press room.[14] Pointing to her testimony to the effect that she had "authorized" their use of the press room,[15] and that she had volun-

---

7. Mancusi v. DeForte, 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); United States v. Rabinowitz, 339 U.S. 56, 63, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Gurleski v. United States, 405 F.2d 253 (5th Cir. 1968).

8. See, *e.g.*, Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); United States v. Thompson, 421 F.2d 373 (5th Cir. 1970); Johnson v. United States, 358 F.2d 139 (5th Cir. 1966); United States v. Sferas, 210 F.2d 69 (7th Cir. 1954), cert. denied sub nom. Skally v. United States, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086.

9. See, *e.g.*, Mancusi v. DeFore, 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); Mapp v. Ohio, 367 U.S. 643, 657, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Holzhey v. United States, 223 F.2d 823 (5th Cir. 1955); United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019 (1951).

10. United States v. Thompson, 421 F.2d 373, 375 (5th Cir. 1970); Gurleski v. United States, 405 F.2d 253, 262 (5th Cir. 1968).

11. Mancusi v. DeForte, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968).

12. Mapp v. Ohio, 367 U.S. 643, 657, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

13. Garza-Fuentes v. United States, 400 F. 2d 219, 222 (5th Cir. 1968). *See* Holzhey v. United States, 223 F.2d 823 (5th Cir. 1955).

14. Both searches are said to have been conducted without proper consent. Additionally, the March 29 search is also attacked as the fruit of the allegedly unlawful February 11 search and as not independently supported by probable cause.

15. The following segment of the record is typical of the inconclusive testimony relied on by appellants:
[Mr. Anderson, attorney for Hoyle]
Q. You had moved completely out?
A. [Mrs. Egger] Not completely, just my clothes.
Q. All right. You made the statement as being the principal property holder of this residence?
A. Yes.
Q. Had you turned the residence over to Mr. Hoyle?
A. No.
Q. Had you authorized him to use it?
A. Yes.
Q. For how long a period?
A. I didn't know how long it would take them. In fact, they were supposed to have did it in just a few days.
Q. Was this done as a result of your conversation with any Secret Service agent?
A. No.
Q. Why did you authorize them to use your premises?
A. Because I didn't oppose Jerry [Hughes] at all.
Q. You just went along with him?
A. Yes.

tarily given Hughes the key to it at his request, appellants argue that they had reserved to themselves the use, control, and access to the room and were thereby protected from a search initiated at Mrs. Egger's request. They rely on Holzhey v. United States,[16] contending that that case establishes a strict rule that a third party may not under any circumstances consent to a search of the "locked personal effects" [17] of another.

*Holzhey* is not applicable here for two reasons. First, the result in that case was expressly based on all the circumstances; it cannot be said that any single rule was laid down.[18] Secondly, in the instant case, the police did not intrude into appellant's "locked personal effects" but into a room in Mrs. Egger's house; ample incriminating evidence was in plain view.

■ Despite their contentions to the contrary, we are of the firm conviction that in the circumstances of appellants' occupancy they should be accorded no property rights in the press room. While we do not presume to comprehend the unfathomable nature of Mrs. Egger's almost perverse attraction for Hughes, it is apparent to us from a reading of the record that she surrendered use of the press room to him in large part out of awed submission to his brutally coercive domination. It was abundantly clear to her that any resistance to his demands, short of seeking police assistance, would be painfully ineffective.[19]

The record is filled with references by Mrs. Egger to her fear of Hughes; she simply did not dare oppose him, and he knew it and acted accordingly. Her state of mind is corroborated by testimony of the secret service agents who observed her on February 11 and throughout the surveillance. Moreover, the fear is by no means unjustified. The effect of the "ride to the lake" speaks for itself. Beatings were not infrequently inflicted by Hughes upon her, and isolated blows come at his whim. On specific occasions he ruptured her eardrum, broke her nose and whipped her with a mimosa branch leaving permanent scars. On one morning she awoke to find that he was holding a gun at her throat after entering her house while she was sleeping.

In these circumstances appellants' attempt to argue that Mrs. Egger, by her complaisance, voluntarily relinquished her right to possession and control of the press room will not stand. Mrs. Egger not only possessed rights in the press room, she affirmatively asserted them by enlisting the protection and as-

16. 223 F.2d 823 (5th Cir. 1955).

17. Id. at 826, 827.

18. The appellant in that case paid nominal rent to live in a garage below the house of her married daughter. With the daughter's generalized consent, police broke into appellant's locked cabinet which they found in the garage and discovered certain items of stolen property. In holding the search unreasonable this court placed emphasis on the following facts: that the police knew or should have known that the cabinet did not belong to appellant's daughter; that appellant paid some rent to her daughter; that prior to the search the daughter suggested that the agents contact her mother before opening the cabinet; and that the police were apparently conducting a warrantless exploratory search. Factual distinctions from the instant case are apparent without discussion.

19. On vigorous cross-examination Mrs. Egger explained her conduct before Hughes was arrested and even while he was in jail, on the basis that she was "literally scared" of him and was afraid to oppose his commands. At one point she stated "If I hadn't acted that way, I would have been killed."

We certainly do not condone Mrs. Egger's conduct. The record shows that she had a serious drinking problem and that she sometimes slept with Hughes. Our wonder at this relationship is enhanced by the series of sentimental letters, complete with lipstick marks, that she sent him in jail while he was awaiting trial. As to the letters and her conduct while Hughes was in jail, Mrs. Egger stated, "I didn't know what friends he had that he might want to harm me." Again she stated, "I was afraid of friends that he might have on the outside."

sistance of law enforcement officers.[20] Unlike many of the third party consent cases,[21] therefore, our recognition of Mrs. Egger's right to consent to a search of her property protects far more than the hypothetically asserted rights of the indifferent or acquiescent consenter.[22] Additionally, the appellants cannot be said to have reserved to themselves by their scurrilous conduct any legally recognizable interests in the privacy of the press room. To say that appellants, in these circumstances, had a "reasonable expectation of freedom from government intrusion"[23] would, in effect, accord judicial protection to those who, by lawless disregard for the interests of orderly society, appropriated a zone of interest to themselves by coercive force.

> Does the Constitution say that this lady may lawfully consent to the entrance into her bathroom of any person in the whole wide world except officers of the government whose duty it is to enforce that government's laws? Does it say that the officers, having entered and seen objects whose only use is to violate the laws, have somehow blundered, so that the conclusive evidence which they have thus discovered cannot thereafter be used by their government to convict the guilty person?[24]

Accordingly, Mrs. Egger's unrevoked oral and written consent, indeed her request, to search her entire house was valid; the search was not unreasonable, and the trial court was correct in admitting the fruits of it into evidence.[25]

## II

Appellants' second major contention is that they suffered prejudicial error in the admission of evidence concerning the guns found at the scene of the crime and argument based thereon. With this we cannot agree. Each gun has been directly connected with one of the defendants. Mrs. Egger testified that both Hughes and Hoyle owned sawed-off shotguns, and that Hughes owned a pistol. Likewise, her son, Glevis, observed both the pistol and "a shotgun that has been sawed off and wrapped with [silver] tape." Hoyle's employer, Mr. Barron, identified the sawed-off shotgun which was wrapped in black tape and found in the press room as "very similar to" a gun which Hoyle on one occasion brought to his place of employment. All of these guns were found in or near the room where the press was located; they serve as an additional link connecting appellants with the crime and corroborating the testimony placing them on the scene at the time of counterfeiting.[26]

20. Cf. Woodard v. United States, 102 U.S. App.D.C. 393, 254 F.2d 312 (1958), cert. denied 357 U.S. 930, 78 S.Ct. 1375, 2 L.Ed.2d 1372 (1958).

21. E. G. Cunningham v. Heinze, 352 F.2d 1 (9th Cir. 1965); Reeves v. Warden, Maryland Penitentiary, 346 F.2d 915 (4th Cir. 1965); Holzhey v. United States, 223 F.2d 823 (5th Cir. 1955); United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019 (1951).

22. Cf. Woodard v. United States, 102 U.S. App.D.C. 393, 254 F.2d 312 (1958). See also Comment, Third Party Consent to Search and Seizure, 33 U.Chi.L.Rev. 797, 811–12 (1966) and nn. 77, 79; Note 79 Harv.L.Rev. 1513, 1519 (1966).

23. Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968).

24. Burge v. United States, 342 F.2d 408, 413 (9th Cir. 1965).

25. Because we have determined that no unreasonable search transpired, we do not discuss the government's contention that appellants had no standing to contest the search.

26. See United States v. Blackburn, 389 F.2d 93, 97 (6th Cir. 1968); Rodriguez v. United States, 284 F.2d 863, 867 (5th Cir. 1960); United States v. McCartney, 264 F.2d 628, 631 (7th Cir. 1959); United States v. Wall, 225 F.2d 904, 907 (7th Cir. 1955); cf. Weiss v. United States, 122 F.2d 675 (5th Cir. 1941) cert. den. 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed.2d 550; C. Wright, Federal Practice & Procedure § 410 (1969).

 Additionally, we think the guns are admissible as part of the *res gestae*.[27] The record of entry and use of Mrs. Egger's home for their counterfeiting operation would be grossly incomplete without the account of their guns, intimidations, beatings, and violence. In some respects the guns were as much a part of this overall counterfeiting operation as was the printing press. In this case, the guns must be regarded as powerful persuaders in the subjugation of Mrs. Egger for securing and maintaining a location for the counterfeit operation.

> Evidence of another crime is admissible where the other offense is logically connected with that charged, or so closely and inextricably mixed up with the history of the guilty act itself as to form a part of the plan or system of criminal action. United States v. Tuffanelli, 7 Cir., 131 F.2d 890. Evidence of another crime is admissible where it is committed as part of the same transaction and forms part of the *res gestae*. Gianotos v. United States, 9 Cir., 104 F.2d 929.[28]

The record clearly demonstrates to us that the guns in question were pertinent evidence because they were so closely blended and inextricably bound up with the history of the crime itself as to constitute a part of the plan or system of criminal action involved in this case.

 Additionally, we note that the trial judge correctly instructed the jury that the guns were to be considered only as evidence bearing upon the issue of intent and as part of the *res gestae*. We perceive no abuse of discretion in the admission of this evidence.

For similar reasons we conclude that the Secret Service agent's picture of the press room was properly authenticated and admitted. We likewise reject appellant Hoyle's contention that a statement made by the prosecuting attorney in his argument to the jury was prejudicial error.[29]

We are convinced that the record is free of error in all respects. The judgment is affirmed.

---

27. United States v. Buccifferro, 274 F.2d 540, 542 (7th Cir. 1960).

28. Id. at 542, citing United States v. Crowe, 188 F.2d 209, 212 (7 Cir.) ; United States v. Carter, 401 F.2d 748, 749 (3d Cir. 1968) ; cf. United States v. Reid, 410 F.2d 1223 (7th Cir. 1969).

Appellants cite and rely on Thomas v. United States, 376 F.2d 564 (5th Cir. 1967) ; Moody v. United States, 376 F.2d 525 (9th Cir. 1967) ; Macklin v. United States, 133 U.S.App.D.C. 347, 410 F.2d 1046 (1969). We distinguish these cases because they do not contain independent evidence that the weapons involved were closely connected with and so bound up with the crimes as to constitute a part of the *res gestae*, or that they were re-lated to the history and plan of the criminal action under consideration.

29. The statement attacked is as follows:

Ladies and gentlemen, of course, during the argument, one of the main reasons for objecting to counsel's argument is because this distracts your thinking from what I am saying. This is one reason that some of those objections are made, so you will lose your trend of thought in this matter as it relates to the facts in this case.

Cf. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Antonelli Fireworks Co., 155 F.2d 631 (2d Cir. 1946).