UNITED STATES of America, Appellee,

v.

Stanley Bernard PETERSON, Appellant.

UNITED STATES of America, Appellee,

v.

Eric Sylvester SMITH, Appellant (two cases).

UNITED STATES of America, Appellee,

v.

Linda LaVern SMITH, Appellant.

UNITED STATES of America, Appellee,

v.

Paul James COATES, Jr., Appellant.

UNITED STATES of America, Appellee,

v.

D'Titinius W. FRAZIER, Appellant.

UNITED STATES of America, Appellee,

v.

Lester IRBY, Appellant.

Nos. 73–2086–73–2091 and 73–2523.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 8, 1974.

Decided Aug. 19, 1975.

Certiorari Denied Jan. 26, 1976. See 96 S.Ct. 881.

Certiorari Denied Feb. 23, 1976. See 96 S.Ct. 1136.

Gary A. Reese, Charlottesville, Va. [Court-appointed counsel], for appellant in Nos. 73–2523 and 73–2087.

Charles Bruce Baird, Vienna, Va. [Court-appointed counsel], for appellant in No. 73–2086.

C. Jeffers Schmidt, Jr., Richmond, Va. (Andrew W. Wood, Richmond Va. [Court-appointed counsel] and Wood and Street on brief), for appellant in No. 73–2090.

Dexter S. Odin, Fairfax, Va. [Court-appointed counsel], for appellant in No. 73–2091.

Donald S. Lilly, Fairfax, Va. [Court-appointed counsel], on brief for appellant in No. 73–2088.

Barry R. Poretz, Alexandria, Va. [Court-appointed counsel], on brief for appellant in No. 73–2089.

J. Frederick Sinclair, Asst. U. S. Atty. (David H. Hopkins, U. S. Atty., on brief), for appellee in Nos. 73–2523, 73–2086–73–2091.

Before HAYNSWORTH, Chief Judge, and BUTZNER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The appellants appeal their convictions for conspiracy to commit bank robbery[1] and for bank robbery.[2] We find the appeal on the part of all appellants without merit and affirm.

On the morning of February 23, 1973 a branch of the Alexandria National Bank was robbed at gunpoint. Six persons—four males and two females—staged a carefully planned and executed robbery. One of the men and one of the women entered the bank and approached the teller counter where teller Mary Guerth was waiting on a bank customer. The male robber, brandishing a pistol, pushed aside the customer, ordered Guerth and the bank's other occupants not to move, and backed toward the bank entrance. Two other men, pulling ski-masks over their faces, entered the bank. One of them leaped over the teller counter and forced teller Guerth to the floor. The second proceeded to the manager's area demanding access to the vault. The woman, following the example of the masked robber, vaulted the teller counter and ordered teller Menette LaFew to the floor. As these three rifled cash from the teller drawers and vault, the fourth robber maintained his vigil at the bank entrance, barking instructions to bank employees and customers.

Meanwhile, outside the bank, a woman driver of a black-over-gold, 1970-model Chrysler, abandoned her car, thus blocking access to the bank's drive-in window, and patrolled the area outside the bank to prevent any interruption of her accomplices by the arrival of new customers. She was joined in this endeavor by a sixth robber, a man dressed in a security guard uniform and carrying a shotgun, who had emerged from a late model, blue Pontiac parked across the street from the bank. One customer, arriving while the robbery was in progress, was forced by the sixth robber to lie prone in the back seat of his vehicle.

After taking money from the tellers' cages and the vault, the four "inside men" joined the two accomplices outside the bank and, together, rushed across the parking lot to the blue Pontiac parked opposite the bank. Bridget Irby, a customer in the bank at the time, observed their escape and twice shouted the license number of the getaway car as it sped away.

After the robbery, an Alexandria police officer, on routine patrol, overheard the police broadcast of the robbery and a description of the getaway car and its license number. Shortly thereafter he spied the getaway car in an alley near appellant Peterson's residence. His investigation revealed that the vehicle had been stolen in the District of Columbia. The owner's license tags were visible on the floor in the rear of the car. The tags on the vehicle, matching the license number of the getaway car, belonged to the appellant Linda Smith. Additional law enforcement officers were immediately summoned to the scene and a house-to-house inquiry of the neighborhood begun. One of the houses visited was the residence of Annie Pearl Peterson, mother of appellant Stanley Peterson. When the officers knocked at the Peterson door, Nina Butler responded and admitted them. As the officers entered they encountered Linda Smith in the living room. Although both Butler and Smith admitted not knowing whose

---

1. 18 U.S.C. § 371.

2. 18 U.S.C. §§ 2113(a)(d) and 2. Counts III and IV of the indictment charging appellants Linda Smith, Paul Coates and Lester Irby with transportation of a motor vehicle in interstate commerce, knowing it to have been stolen in violation of 18 U.S.C. §§ 2312 and 2, were dismissed by the Court.

house they were in, both claimed to be alone and that "they were visiting with some other friends." The officers asked if it was all right for them to "look around" and upon Butler's consent, they proceeded to do so. One of the officers observed Paul Coates and Eric Smith in an upstairs bedroom lying on a bed fully clothed. After summoning the other police and FBI agents in the neighborhood, Coates and Smith were brought downstairs. All four occupants of the house were separately interviewed. During these interviews, several members of the Peterson family who lived nearby came to the house. After determining that the house belonged to Mrs. Peterson, the police requested of Mrs. Peterson's daughter consent for a search of the premises. The daughter informed the police that Mrs. Peterson was the only person with authority to consent to the search and that she had been summoned and would arrive momentarily. When Mrs. Peterson arrived, she was unable to identify any of the persons the police had found occupying her home. Mrs. Peterson was advised of her right to withhold consent to search but, according to the officers, she was "pleased to allow us to search * * *, she worked for the Government, she did not know what these people were doing here, she was glad to cooperate." She did request that the officers not search her own room because, as she said, "[I]t has a padlock on it and nobody has been in there." The officers readily agreed. Mrs. Peterson then signed a written consent form authorizing a search of the remainder of the house. A search of the bedroom where Coates and Smith were found revealed a loaded .12 gauge Savage shotgun, later identified at trial as

being similar to the one used by the robber wearing the security guard uniform; a large, wide-brimmed gray hat, identified as being similar to the hat worn by the robber who stood by the bank entrance; and a twenty dollar bill of the bank's "bait money." In several garbage pails located in the back yard of the premises, the police recovered a wig similar to the one worn by the woman inside the bank, several striped pillow cases, Alexandria National Bank money bags, two pairs of gloves, $163.12 in change wrapped in the bank's coin wrappers, and a security guard uniform similar to the one worn by the robber patrolling the parking area.

At trial, the Government offered both direct and circumstantial evidence to delineate the roles played by each defendant in the robbery and attendant conspiracy. On the day before the robbery, Eric Smith and Janet Awkard,[3] posing as potential customers were identified as persons who had visited the branch bank. Janet Awkard made inquiry as to opening an account while Eric Smith sat in the front of the bank, waiting for her. They left without transacting any bank business. There was testimony that later that evening, Eric Smith, Awkard, Irby, Coates, Linda Smith and Nina Butler assembled at Eric Smith's apartment and reviewed a diagram.[4]

At approximately 6 a. m. on the morning of the robbery, Frazier, wearing a security guard uniform, Eric Smith and Nina Butler left Eric Smith's apartment in Washington, D. C. to go to Stanley Peterson's home in Alexandria in Eric Smith's yellow Buick. According to the prosecution witness, they were met there by Linda Smith, Irby, Coates and Awk-

---

3. Although jointly indicted with the appellants, Janet Awkard eluded capture and remained a fugitive throughout the proceedings. Her role in the conspiracy was established by Nina Butler, the Government's chief witness. Velma Wilkens, the bank manager, made a positive photographic identification of Awkard as Eric Smith's female companion on the day prior to the robbery as well as during the robbery the next day.

4. The events transpiring at Smith's apartment were disclosed by the testimony of Nina Butler. Although Butler incredibly claims not to have been privy to the actual conversations relating to the diagram, the obvious inference is that the discussion centered on the robbery plans. Cf. Glasser v. United States (1942) 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Sherman (4th Cir. 1970) 421 F.2d 198, cert. denied 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970).

ard who had driven to Alexandria from the District of Columbia in two other cars—later identified as the blue Pontiac getaway car and the gold Chrysler, abandoned at the bank's drive-in window. All seven, wearing gloves, carrying two pistols and one shotgun, a pillow case and ski masks, were admitted to the Peterson residence by Stanley Peterson.[5] The group remained in the Peterson home until approximately 9 a. m., when Eric and Linda Smith, Coates, Irby, Frazier and Awkard left in the blue Pontiac and the gold Chrysler. Stanley Peterson left shortly thereafter to be seen in other parts of town and thus, according to the Government's testimony, to establish his alibi.[6]

It is undisputed that the two automobiles used in the robbery had been stolen shortly before the robbery in the District of Columbia. The dark blue Pontiac used as the getaway car belonged to Richard Johnson, who positively identified Lester Irby as one of the two thieves accosting him and stealing his car. The Chrysler, abandoned at the bank, had been stolen the night before the robbery from the Reverend Randery J. Dockery. Dockery identified Coates and Linda Smith as the two who had stolen his car and wallet. His identifications were bolstered by Butler's testimony that Smith and Coates had left Eric Smith's apartment after the discussion of the diagram, and returned a short time later displaying a wallet and boasting that they had stolen it and a car from "some reverend." Dockery also identified the red coat worn by Linda Smith that evening.

Eye witnesses to the bank robbery made several positive identifications of the participants. Two witnesses identified Eric Smith as the man who first entered the bank and stood at the bank entrance during the robbery. Janet Awkard was identified as his female companion. Frazier was identified by the customer forced into the back seat of his car as the man carrying the shotgun and wearing the security guard uniform. Although not directly identified, Linda Smith's general description matched that of the woman driving the gold Chrysler.

On the basis of this record, the District Court submitted the cause as against all the defendants to the jury, which in turn returned a verdict of guilty as to all. The defendants have appealed from their convictions.

We find no merit in the appellants' initial contentions that the evidence was insufficient to support their convictions. The evidence in the record, as already detailed, amply sustains the jury's findings that each appellant was guilty of the crimes charged beyond a reasonable doubt. *Glasser v. United States, supra*

**5.** At about 7:30 that morning, five or six persons—one dressed in a white coat and a black hat, and one in a guard's uniform—were observed entering the Peterson home by a neighbor who identified photographs of the two cars used in the bank robbery. Butler's testimony, as well as the testimony of Philip Peterson, Stanley's brother who was home at the time of the defendants' arrival, established that Stanley Peterson met the appellants at the door and admitted them. Philip Peterson testified that he was so frightened by the appearance of the strangers that he immediately fled the premises.

**6.** It was never the Government's contention that Stanley Peterson was one of the four male robbers. In fact, the testimony of Officer Washington, an Alexandria police officer, established that Peterson was in another part of town both during and after the time of the actual robbery. Stanley's role in the crime was confined to conspiring with his cohorts in the planning of the robbery and in aiding and abetting the commission of the crime by allowing his codefendants to use his home as a staging area before the robbery and as a sanctuary afterwards.

The most damaging evidence of Peterson's involvement came from the testimony of Jeffrey Heyer, Peterson's former cellmate. Heyer testified that Peterson had boasted that $9,000 (the amount unrecovered from the robbery) was still safely hidden inside the house and that he would "walk at the preliminary" because he had arranged to be seen in various parts of town at the time of the robbery. According to Heyer, Peterson had also expressed dissatisfaction that some of his codefendants had entered through the front door of his home, rather than through the back door as originally planned.

(315 U.S. 60, 62 S.Ct. 457); *United States v. Sherman, supra* (421 F.2d 198).

■ Turning to the other grounds of appeal: The defendant Stanley Peterson argues specially on appeal that, as to him, the verdict was improper. He was indicted in Count I for conspiracy and in Count II for the substantive offense of bank robbery, the object of the conspiracy. Although the indictment did not designate Peterson as an aider and abettor, all indictments are read as if the alternative provided by the aiding and abetting statute, 18 U.S.C. § 2, is included therein.[7] Peterson's conviction as a principal in the bank robbery obviously flowed from such a finding. Peterson contends, however, that his convictions on the two Counts were multiplicitous— that conspiracy to rob a bank is the equivalent in law of aiding and abetting the commission of the bank robbery— and thus what was essentially one criminal act has been pluralized into two offenses and punishments.[8] But conspiracy is a separate and distinct offense from that of aiding and abetting, and involves the additional element of preconcert and connivance not necessarily inherent in the mere joint activity common to aiding and abetting. *Clermont v. United States* (9th Cir. 1970) 432 F.2d 1215, 1216, *cert. denied* 402 U.S. 997, 91 S.Ct. 2182, 29 L.Ed.2d 163 (1971); *United States v. Tierney* (9th Cir. 1970) 424 F.2d 643, 645, *cert. denied* 400 U.S. 850, 91 S.Ct. 53, 27 L.Ed.2d 87 (1970); *United States v. Tropiano* (2d Cir. 1969) 418 F.2d 1069, 1083, *cert. denied* 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970). Peterson's conviction for aiding and abetting was in no way dependent upon a finding of a criminal *agreement* which is the gist of his conspiracy conviction. The trial court's charge to the jury adequately set out the elements of conspiracy and the substantive offense of bank robbery, as well as the law of aiding and abetting. The fact that the Government's evidence served "double duty" in establishing the elements of both Counts is of no consequence and no duplication was involved in Peterson's convictions for conspiracy and, as an aider and abettor, for bank robbery.[9]

■ Nor do we find merit in Peterson's contention that the Government's failure to produce a "statement" by witness Jeffrey Heyer requires us to purge Heyer's testimony and to set aside the conviction. Prior to trial and pursuant to Rule 16, Fed.R.Crim.P., Peterson's counsel moved for the discovery and inspection of "all statements, confessions or admissions made by the defendant, written or otherwise recorded, or oral statements subsequently reduced to writing." Counsel was accordingly provided complete access to the Government's file. There was no written statement by Heyer in the file and it is undisputed that the Government Attorney was neither in possession of nor aware of the existence of any such "statement" and so represented to the Court prior to trial. After Heyer testified at trial, examination of the investigating FBI agent revealed that a "302" FBI memorandum had been prepared by the agent as a "result of an interview" with Heyer.[10] It is this FBI

7. *United States v. Duke* (4th Cir. 1969) 409 F.2d 669, 671, *cert. denied* 397 U.S. 1062, 90 S.Ct. 1497, 25 L.Ed.2d 683 (1970); *United States v. Lester* (6th Cir. 1966) 363 F.2d 68, 72, *cert. denied* 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967).

8. Peterson was sentenced to fifteen years' imprisonment on the substantive count to run concurrently with a five year term imposed on the conspiracy count.

9. *See, e. g., Nye & Nissen v. United States* (1949) 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; *United States v. McGowan* (4th Cir. 1970) 423 F.2d 413; *United States v. Clements* (5th Cir. 1973) 484 F.2d 928, *cert. denied* 415 U.S. 991, 94 S.Ct. 1591, 39 L.Ed.2d 888; *United States v. Jackson* (10th Cir. 1973) 482 F.2d 1167, *cert. denied* 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111; *United States v. Castro* (9th Cir. 1973) 476 F.2d 750.

10. The agent intended to incorporate the substance of the memorandum into a written report of the investigation which had not been compiled at the time of trial. The report, apparently prepared after the interview, contained the agent's version of the interview. This memorandum, if producible at all, is to be governed by the provisions of the Jencks Act,

memorandum that Peterson now claims, for the first time, to have been a statement subject to production under the provisions of the Jencks Act, 18 U.S.C. § 3500. But, on the record before us, we would be constrained to view the memorandum as merely the agent's personal summary of the interview to serve to refresh his memory in later preparing a written report of the investigation.[11] Manifestly, nothing in the Act compels the production of FBI memoranda prepared *"as a result and after the interview"* of the witness,[12] as was the case here.

■ In any event, the trial court was never afforded a clear and suitable request to rule on the applicability of the Jencks Act to the memorandum. Peterson's counsel knew in advance the substance of Heyer's testimony and the Government made an accurate proffer of the testimony prior to Heyer's examination at trial. Even after the FBI agent's disclosure of the existence of the memorandum immediately following Heyer's testimony, defense counsel failed to demand its production or to request the trial court to inspect it. Nor did counsel move to strike Heyer's testimony. Peterson's motion for a new trial made no mention of the nonproduction of the report as a basis for error in the trial. Although Peterson's counsel, it is true, did make a broad pretrial discovery motion arguably encompassing Jencks Act material, "a Jencks Act request is wholly inappropriate in a pretrial motion for discovery," and we think defense counsel, in order to invoke the benefits of the Act, was obligated at the very least to alert the trial judge *during the course of the trial* to his request by demanding the production and inspection of the memorandum when its existence became known and not "simply by means of some multi-pronged pre-trial motion."[13] Under these circumstances, we conclude that Peterson's counsel is foreclosed from raising on appeal any issue relating to the production of the FBI memorandum.

■ D'Titinius Frazier's assignments of error center on his identification as the bank robber wearing a security guard uniform. He contends that the in-court identification testimony of James Odin, the bank customer forced at gunpoint to lie in the rear of his automobile, was impermissibly tainted by the Government's display of photographs to the witness on the morning of the trial.

18 U.S.C. § 3500, and not the discovery motion made pursuant to Rule 16. *United States v. Wilcox* (4th Cir. 1974) 507 F.2d 364, 374; *United States v. Kenny* (3d Cir. 1972) 462 F.2d 1205, 1212, *cert. denied* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972).

11. Form FD 302 interview reports are routinely prepared for such purposes. While under certain circumstances such memoranda might arguably be construed as Jencks Act material, generally, as was observed in *United States v. Pacheco* (5th Cir. 1974) 489 F.2d 554, 566, cert. den., 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774:

> " * * * Form FD 302 interview reports * * * [do] not become 'statements' subject to production under the Act until * * * [the witness has] examined their content and confirmed that they * * * [are] accurate."

There is no indication in the record that Heyer signed or otherwise adopted or approved the report.

12. *Matthews v. United States* (5th Cir. 1969) 407 F.2d 1371, 1375 (emphasis in original).

*Cf. Palermo v. United States* (1959) 360 U.S. 343, 353, 79 S.Ct. 1217, 3 L.Ed.2d 1287; *United States v. Goldenstein* (8th Cir. 1972) 456 F.2d 1006, 1012, *cert. denied* 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974); *United States v. Blackburn* (5th Cir. 1971) 446 F.2d 1089, 1090, *cert. denied* 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972); *Tarvestad v. United States* (8th Cir. 1969) 418 F.2d 1043, 1050, *cert. denied* 397 U.S. 935, 90 S.Ct. 944, 25 L.Ed.2d 116 (1970).

13. *United States v. Harris* (5th Cir. 1972) 458 F.2d 670, 679–80, *cert. denied* 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972). *See, also, United States v. Keine* (10th Cir. 1971) 436 F.2d 850, 853, *cert. denied* 402 U.S. 930, 91 S.Ct. 1531, 28 L.Ed.2d 864 (1971); *United States v. Paroutian* (2d Cir. 1963) 319 F.2d 661, 664, *cert. denied* 375 U.S. 981, 84 S.Ct. 494, 11 L.Ed.2d 426 (1964); *Ogden v. United States* (9th Cir. 1962) 303 F.2d 724, 733, *cert. denied* 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86 (1964); *Williams v. United States* (D.C. App.1969) 252 A.2d 893, 894.

But the photographic display was identical to the spreads shown to the witness after the robbery and from which he had twice identified Frazier.[14] From our review of the record, we find not even the slightest suggestion of impropriety in the manner in which the photographs were exhibited to Odin at either the initial showings or later, prior to trial; nor does Frazier contend otherwise. Consequently, we are convinced that Odin's repetition of his earlier identifications, using the identical, and admittedly proper, procedures initially employed after the robbery, was not a procedure "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" within the proscriptions of *Simmons v. United States, infra* (390 U.S. at 384, 88 S.Ct. at 971). *Cf. United States v. Hines* (1972) 147 U.S.App.D.C. 249, 455 F.2d 1317, 1330–31, *cert. denied* 406 U.S. 969, 92 S.Ct. 2427, 32 L.Ed.2d 669 (1972); *United States v. Washabaugh* (9th Cir. 1971) 442 F.2d 1127, 1129–30. Moreover, even the slightest suspicion that Odin's in-court identification emanated from any source other than his observations on the day of the robbery is dispelled by the particularity of his description and account of the events of that day. *See United States v. Wilcox, supra* (507 F.2d at 372–73); *Stanley v. Cox* (4th Cir. 1973) 486 F.2d 48, 55, *cert. denied* 416 U.S. 958, 94 S.Ct. 1975, 40 L.Ed.2d 309 (1974). Frazi-

er's argument is otherwise reduced to the meritless claim that the identification evidence was insufficient to provide a basis for his conviction. Even apart from Odin's identification, it was clearly established that Frazier arrived and departed the Peterson home wearing a security guard uniform, riding in one of the cars used in the commission of the robbery, and in the company of other appellants who were positively identified by eyewitnesses as participants in the robbery. Clearly, the identification evidence was sufficient to warrant the jury's conclusion that Frazier was the bank robber wearing the uniform.[15]

■ Linda Smith argues that the Court erred in refusing to grant a mistrial based on a passing remark between two women jurors overheard in the lady's room after jury deliberations had commenced. One juror allegedly made a remark to the effect that, "this reminds me of the Angela Davis trial," adding, "I hope that I have not frightened you by saying that." When the matter was called to the Court's attention, the District Judge recalled the jury, identified the two jurors involved and questioned them to determine if the remark might adversely affect their deliberations. After thus exploring any potential source of prejudice, the Court denied Smith's motion for a mistrial, concluding that the two jurors had not been "deliberating" apart from the other jurors and

---

14. After the robbery, Odin was first shown a spread of photographs from which he selected Frazier, indicating that he was "50 per cent" certain that the man in the photograph was the bank robber wearing the security guard uniform. A second group of photographs, including a photo of Frazier was again exhibited to Odin. He repeated his identification of Frazier, this time stating that he was "70 per cent" certain. Provided at trial with his first opportunity to observe Frazier in person, Odin, without hesitation, identified Frazier from among the persons in the court room as the robber. Odin explained that any difficulty he may have experienced in making his photographic identifications resulted from the poor quality of the photographs rather than any uncertainty as to the robber's actual appearance. Denying that the repetition of his photographic identification on the day of trial had aided his

in-court identification, he asserted that Frazier "looks more like the man at the bank than the photographs do."

15. Nor do we find error in the manner the District Judge instructed the jury to receive identification evidence when measured by the then-prevailing standard as set forth in *United States v. Levi* (4th Cir. 1968) 405 F.2d 380.

In *United States v. Holley* (4th Cir. 1974) 502 F.2d 273, we *prospectively* adopted a more detailed model instruction on the evaluation of identification evidence patterned after the rule announced in *United States v. Telfaire*, 152 U.S.App.D.C. 146, 469 F.2d 552 (1972). In the instant appeal, the District Judge could not have reasonably anticipated our decision in *Holley* and we, therefore, judge the adequacy of his instructions by the rule of this Circuit in effect at the time of the trial.

that the remark had created no fear or apprehension on the part of either juror that might affect their verdict. We find no abuse in the exercise of the trial court's discretion, either in the manner in which the examination was conducted or in the denial of the motion, and, accordingly, no merit in Smith's argument. *Wiltsey v. United States* (4th Cir. 1955) 222 F.2d 600, 601; *Tillman v. United States* (5th Cir. 1969) 406 F.2d 930, *cert. denied* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

■ Lester Irby contends that he was denied effective representation of counsel at trial because his attorney, relying on Government representations that the case against him might be dismissed if witness Nina Butler were not located, delayed trial preparations until shortly before trial when the witness was found. Although counsel, appointed approximately seven weeks prior to trial, was afforded more than a reasonable opportunity to prepare Irby's defense, we are concerned here with the effect rather than the fault of the delay. *Coles v. Peyton* (4th Cir. 1968) 389 F.2d 224, 226, *cert. denied* 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968). Notwithstanding counsel's delay, we are convinced that Irby was adequately represented at trial. Counsel had been provided complete access to the Government's file. He was familiar with the Government's case against Irby, the substance of each witness's proposed testimony, and, at trial, thoroughly cross-examined them. He had conferred sufficiently with Irby to elicit from him matters essential to establishing an alibi defense which was, although ultimately discounted by the jury, fully and adequately presented at trial. At the beginning of the trial, counsel suggested to the Court that he had been forced to prepare for trial in a too-limited amount of time. The District Judge immediately offered Irby a continuance if counsel were unprepared to proceed but counsel, after conferring with Irby, declined the offer. Indeed, no argument is advanced that, if the offer of a continuance had been accepted or extended preparation time provided, trial counsel would or could have pursued a different trial strategy or defense. Under these circumstances, we are persuaded that, despite counsel's delay in beginning his trial preparations, Irby was not denied effective assistance of counsel.

■ The primary attack by the defendants in this appeal relates to the validity of the police search of the Peterson premises. Stanley Peterson and his codefendants Linda Smith, Eric Smith and Paul Coates joined in a pretrial motion to suppress *all* of the physical evidence found as a result of that search. They made no contention that Mrs. Peterson lacked the requisite authority to consent to the search but, rather, argued that her consent, given after the police officers had arrived at her home, was involuntary. Following an evidentiary hearing held pursuant to Rule 41(e), in which Peterson's codefendants failed to establish the legitimacy of their presence on the Peterson premises,[16] the District Court found that Mrs. Peterson's consent had been freely and voluntarily given. On its own motion, however, the District Court concluded that the bedroom in which some of the contested items had

---

16. At the suppression hearing the codefendants, obviously assuming that their presence on the premises without more was sufficient to confer standing to challenge the propriety of the search, were content to remain silent and to adopt as their own the testimony presented on behalf of Stanley Peterson. But none of this testimony established Peterson's consent for them to use his home or, for that matter, that they were anything more than mere trespassers on the premises. Consequently, none of the codefendants, by virtue of their apparently wrongful presence, could claim the requisite standing at the time of the suppression hearing to have the merits of their motion adjudicated. *Jones v. United States* (1960) 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697. *See also Mancusi v. DeForte* (1968) 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154; *Simmons v. United States* (1968) 390 U.S. 377, 390, 88 S.Ct. 967, 19 L.Ed.2d 1247. *Cf. United States v. Dye* (6th Cir. 1974) 508 F.2d 1226, 1233.

been discovered was "set apart" for the use of defendant Peterson and that his mother was without authority to consent to a search of such room as against the rights of her son. It accordingly ruled that the evidence taken in the search of the bedroom was inadmissible against Stanley Peterson.

On appeal the appellants redouble their efforts in an attempt to persuade us that the District Court erred in finding that Mrs. Peterson's consent was freely and voluntarily given. This, however, is a factual question, to be determined by the trier of fact in light of the "totality of all the surrounding circumstances" and is binding on us unless clearly erroneous. *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854. Manifestly, the mere presence of police officers in the Peterson home, absent any indication of coercive words or acts on their part, is insufficient to raise an inference that Mrs. Peterson's consent was an unwitting and unwilling submission to police authority. *United States v. Vickers* (4th Cir. 1967) 387 F.2d 703, 706–7; *United States v. Savage* (5th Cir. 1972) 459 F.2d 60, 61, *vacated on other grounds* (5th Cir. 1973), 483 F.2d 67; *United States v. Stone* (7th Cir. 1972) 471 F.2d 170, 173, *cert. denied*, 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391 (1973). She found her home occupied, without explanation, by four strangers suspected of a nearby bank robbery. Despite the presence of the officers, she was in the familiar surroundings of her own home and in the company of her own family. She was specifically informed of her right to withhold her consent before signing the proffered consent form, and, in fact, partially exercised that right by in effect refusing to permit a search of her own bedroom. Not only was the District Court's finding not clearly erroneous, it was supported by the overwhelming evidence in the case.

Peterson's codefendants alternatively press the claim that they are entitled to assert the same right of privileged privacy as Stanley Peterson was held by the District Court to have in connection with the search of the bedroom used by him and his two brothers in the mother's home and that Mrs. Peterson's consent to the search of that room was no more valid as against them than as against her son. This claim, however, was not advanced until trial and only after the items discovered as a result of the search had been received in evidence. These defendants would justify their delay in asserting the claim because, as they argue, the claim did not have a basis in the record until Stanley Peterson's role in the robbery had been developed by a Government witness and until it was testified that Peterson had given them permission to be in his mother's house. However, they knew from the outset, and particularly at the pretrial suppression hearing, that Stanley Peterson had given them permission to be in the Peterson residence. They could have testified at the suppression hearing to the circumstances under which they were present in the Peterson home without in any way compromising their rights to remain silent at trial and without any fear that their testimony would be used against them. *Simmons v. United States, supra,* 390 U.S. at 389–90, 88 S.Ct. 967. Under these circumstances, we think it was their obligation under Rule 41(e) to make their derivative claim of constitutional privacy before trial. Having been afforded a full opportunity *at their own request* to present any and all grounds which might have arguably justified the suppression of the questioned evidence, the District Court (had it chosen to do so) would have been acting well within its discretion in refusing to entertain their belated claims during the course of the trial. *Cf. United States v. Cobb* (4th Cir. 1970) 432 F.2d 716, 718, n. 2; *United States v. Blythe* (4th Cir. 1963) 325 F.2d 96; *United States v. Mauro* (2d Cir. 1974) 507 F.2d 802, 807, *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975).

Even apart from the untimeliness of their claim, we are not persuaded on the

record before us that Peterson, much less the codefendants, was entitled to the benefit of the trial court's suppression ruling. Although the mother testified at the suppression hearing that one of the two bedrooms in the house—the one in which the questioned items were discovered—was used by her three sons, this testimony was the full extent of the testimony on the relationship of Stanley Peterson to the room searched.[17] The motion to suppress was based solely on the alleged involuntariness of the consent given and not on any absence of authority to consent. For that matter, neither the mother nor appellant Peterson or his counsel ever contended that the mother had relinquished her control of the room or her ability to designate what use, if any, could be made of that room by Peterson. Such a record hardly justifies a finding of a want of authority in the mother to consent to a search of the bedroom as against her son.

■ In reaching its conclusion, the District Court relied on our decision in *Reeves v. Warden, Maryland Penitentiary* (4th Cir. 1965) 346 F.2d 915. But *Reeves* established no strict rule that a mother may not under any circumstances consent to a search of a room in the family home occupied by her child, particularly when shared, as here, by other children in the family. Such determinations should be approached with great circumspection and made only upon a clearly defined record. Indeed, the facts of *Reeves* were quite different from those in this appeal. In *Reeves,* the home searched was that of a sister. Permission to search was given by the mother, who together with her son, occupied rooms in the sister's home merely "as a tenant or guest." The room searched was "regularly and exclusively occupied by * * * [the son];" it had been "'set aside exclusively for * * * [his] use, * * *.'"[18] In this case, however, the home searched was that of the mother. She maintained it as a family home. She made it available to all her children living at home with her, including Stanley Peterson. All the children recognized it as belonging to the mother and as being under her "control." That was the basis given by the daughter who, in refusing to give her consent, told the police that *only* her mother had the authority to consent to a search.

Had the issue been presented to us initially, we would have concluded the search valid as to Stanley Peterson. We find particularly persuasive in arriving at that result *Maxwell v. Stephens* (8th Cir. 1965) 348 F.2d 325, *cert. denied,* 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965), *reh. denied,* 382 U.S. 1000, 86 S.Ct. 532, 15 L.Ed.2d 490 (1965). There, Mr. Justice (then Circuit Judge) Blackmun, upholding the right of a mother to consent to a search of a room in the home shared, as here, by the defendant with his two younger brothers, said (pp. 336–37):

"What then, is the effect of this voluntary consent on the part of Maxwell's mother? We recognize, of course, that constitutional rights are not to depend upon 'subtle distinctions, developed and refined by the common law in evolving the body of private property law.' *Jones v. United States,* supra, 362 U.S. 257, 266, 80 S.Ct. 725, 733, 4 L.Ed.2d 697, 733 (1960). But this is not a case of property right distinctions. The defense concedes

---

17. Defense counsel exhibited a diagram of the Peterson residence for the purpose of illustrating Mrs. Peterson's testimony and the following colloquy transpired (Trial Transcript at pp. 5–6):

 DEFENSE COUNSEL: Does this diagram on the right marked as Exhibit B represent accurately the upstairs of your residence?
 MRS. PETERSON: Yes.
 DEFENSE COUNSEL: Can you describe who uses Bedroom 1?

MRS. PETERSON: Yes. That bedroom is used by my three boys, which is [sic] Stanley, Philip and Gary.
DEFENSE COUNSEL: And Bedroom 2?
MRS. PETERSON: It is occupied by myself.
DEFENSE COUNSEL: And those are the only residents of that house?
MRS. PETERSON: Right.

18. 346 F.2d at 924.

that Mrs. Maxwell possessed a proprietary interest in the house; that Maxwell himself only shared a room there with his two younger brothers; and that no landlord-tenant relationship existed between Maxwell and his parents. Mrs. Maxwell had control of the premises, undiminished by any kind of less-than-fee interest possessed by Maxwell. This fact stands in contrast to the hotel or rental situations. [Citations omitted.] The situation strikes us as being no different, factually, than if Mrs. Maxwell herself had brought * * * [the seized item], it being properly in her possession, to the authorities. They came to the home, it is true, but they obtained * * * [it] by freely allowed access to the house * * *."[19]

Similarly, in *United States v. DiPrima* (1st Cir. 1973) 472 F.2d 550, the Court rejected the contention of the 22-year old defendant that his mother was without authority to consent to a search of the bedroom in her apartment utilized, so the son claimed, "exclusively" by him. As in this appeal, the mother was the head of the single-family household and her apartment was the family home. The mother had access generally to the son's room. The son shared the room with one of his younger brothers. In finding "authority in the mother, as the householder, to give a general consent" to search the room, the Court remarked (472 F.2d at 551–52):

> "Finally, we remark that 'exclusive' possession is not an absolute term. A hotel clerk may have a key to a room, and so may the cleaning staff, but the clerk will not have apparent authority to consent to a search. *Stoner v. California,* 1964, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856. * * * even if [the son], living in the bosom of a family, may think of a room as 'his,' the overall dominance will be in his parents. We cannot pronounce a rule that will

answer all cases, except to say that to some extent *the police must be allowed to rely upon the word of the householder and general appearances. In the case at bar they had both."* (Emphasis added.)

Manifestly, if the authority to consent to a search against the rights of her son were valid, there could be no basis for the argument of the codefendants that they were entitled to share in the suppression of the fruits of that search.

Our view finds reinforcement in *United States v. Matlock* (1974) 415 U.S. 164, 170–71, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, which makes clear "that the consent [to search] of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared" and that "permission to search" may be "obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." It is undisputed that upon her arrival, Mrs. Peterson assumed the absolute authority to speak on the right to search. She made no reference to her three sons or even indicated that any room was "set aside exclusively" for their use. At the time of the search, she had access to and complete control of the entire premises, including the bedroom used by her children. The officers, on the other hand, had no reason to assume that anyone other than the mother had authority to permit a search. In short, every circumstance points inescapably to the conclusion that the searching officers acted in perfect good faith in relying on the authority exercised by the mother, and affirmed by the sister, to consent to the search. *At the very least,* Mrs. Peterson possessed "the necessary appearance of authority demanded by *Matlock*" to validate a search based on her consent. *United States v. Sells* (7th Cir. 1974) 496 F.2d 912, 914.[20] Given the na-

---

**19.** *See also United States v. Mix* (5th Cir. 1971) 446 F.2d 615; *United States Ex Rel. Combs v. LaVallee* (2nd Cir. 1969) 417 F.2d 523, 526, *cert. denied* 397 U.S. 1002, 90 S.Ct. 1150, 25 L.Ed.2d 413 (1970).

**20.** *Matlock, supra,* 415 U.S. at 177, n. 14, 94 S.Ct. at 996, left open the question answered in *Sells* of whether a third party consent search may be validated in a showing that "the searching officers reasonably believed

ture of the home as a family dwelling and the fact that the mother, as owner and head of the single-family household, designated what use, if any, could be made of the premises including the bedroom in question, we think it was "reasonable to recognize" that the mother had the authority "to permit the inspection in * * * [her] own right."[21] Despite the fact that Stanley Peterson was one of the members of the family using the bedroom, Mrs. Peterson's access and control over the entire premises, as well as her substantial interest in or "sufficient [other] relationship to" the premises,[22] vested her with sufficient authority under any aspect of the case to consent to a search of the room as against the rights of the codefendants as her son's "guests", and we so hold.[23]

In any event, even if Mrs. Peterson were without authority to permit the

search of the bedroom directed against the codefendants and the search was unconstitutional, we are convinced that the introduction of the seized items—the hat, shotgun and bait bill—was harmless beyond a reasonable doubt. *Chapman v. California* (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705; *Young v. State of Maryland* (4th Cir. 1972) 455 F.2d 679, 680, *cert. denied,* 407 U.S. 915, 92 S.Ct. 2450, 32 L.Ed.2d 691 (1972); *United States v. Simuel* (4th Cir. 1971) 439 F.2d 687, 689, *cert. denied,* 404 U.S. 836, 92 S.Ct. 122, 30 L.Ed.2d 68 (1971). Although the hat, shotgun and bait bill seized as a result of that search arguably connected the codefendants to the crime, each of the defendants attempting to exclude the questioned articles was inextricably linked to his participation in the bank robbery by other, overwhelming evidence properly admitted at trial.[24]

that * * * [the consenting party] had sufficient authority over the premises to consent to the search."

Application of the exclusionary rule to the fruits of a search conducted under the circumstances in this appeal would seem inappropriate. This is so because the rule is designed "to deter future unlawful police conduct" and not to repair the "personal constitutional right of the party aggrieved." *United States v. Calandra* (1974) 414 U.S. 338, 347–48, 94 S.Ct. 613, 620. This deterrent function "necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. * * * Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." *Michigan v. Tucker* (1974) 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182; *cf., United States v. Peltier* (1975) 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374; *Brown v. State of Illinois* (1975) 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (Powell, J., concurring).

**21.** *Matlock, supra,* 415 U.S. at 171, n. 7, 94 S.Ct. at 993.

**22.** 415 U.S. at 171, 94 S.Ct. 988.

**23.** The *Fourth Amendment* guarantee against unreasonable searches and seizures protects "people, not places" and extends only to what a person can reasonably expect to maintain as private. *Katz v. United States* (1967) 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576. Whatever expectations of privacy these codefendants may have acquired because Stanley Peter-

son granted them access to his mother's home generally, we are not prepared to say that such expectations are ones that "society is prepared to recognize as 'reasonable'." *Katz, supra,* 389 U.S. at 361, 88 S.Ct. at 516, Harlan, J., concurring.

Even according them the status of guests, Mrs. Peterson's interest in the integrity of the premises was clearly superior to any privacy interest held by the codefendants. *See United States v. Missler* (4th Cir. 1969) 414 F.2d 1293, 1301–2, *cert. denied,* 397 U.S. 913, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970); *Bowles v. United States* (1970) 142 U.S.App.D.C. 26, 439 F.2d 536, 540–1, *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971); *Calhoun v. United States* (5th Cir. 1949) 172 F.2d 457, 458. As a practical matter, the codefendants viewed Peterson's bedroom no differently from the other areas of the house for which Mrs. Peterson in any view had unquestioned authority to consent to a police search. In making use of the Peterson home, we think, too, they assumed the risk that Mrs. Peterson might voluntarily consent to a search of the home directed against them.

**24.** Without attempting to catalogue all of the incriminating evidence properly introduced against these defendants, we would point generally to the testimony of Nina Butler as establishing their roles in the conspiracy and robbery. Additionally, Linda Smith and Paul Coates were positively identified as the thieves who stole the car used in the robbery and later abandoned at the bank. Eric Smith was positively identified as the robber wearing the gray

*United States v. Pravato* (2d Cir. 1974) 505 F.2d 703, 704.

As a corollary to the foregoing issues, Stanley Peterson contends that the broad deterrent purposes underlying the exclusionary rule fashioned in *Weeks v. United States* (1914) 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 and *Mapp v. Ohio* (1961) 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, *reh. denied*, 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d 72 (1961), require that the evidence suppressed as to him should not have been used at all. In *Alderman v. United States* (1969) 394 U.S. 165, 171, 89 S.Ct. 961, 22 L.Ed.2d 176, *reh. denied* 394 U.S. 939, 89 S.Ct. 1177, 22 L.Ed.2d 475 (1969), the Court expressly rejected such an expansive reading of the rule to proscribe the use of illegally seized evidence in "all proceedings or against all persons."[25] The mere fact that evidence may be inadmissible against a defendant does not preclude its use against a codefendant if it is otherwise admissible against him. *See, e. g., Brown v. United States* (1973) 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208. Peterson contends, however, that because he was jointly tried with the defendants, a different result is required. Arguably, had the Government sought "to use * * * [the illegally seized] evidence to incriminate the victim of the unlawful search,"[26] application of the

exclusionary rule, or, alternatively, a severance from the joint trial, may have been warranted. But the Government's proof completely disassociated Peterson from the items found in his bedroom, since they could have been placed there only *after* the robbery and *during* the period in which Peterson's presence in another part of town was established.[27] Consequently, there can be no substantive basis for a finding that the items taken from his room were used to incriminate him. Moreover, the trial court carefully labeled the evidence as being admissible only against the codefendants and repeatedly admonished the jury to disregard the evidence as implicating Peterson in any way. Not only was the evidence thus confined solely to implicating the codefendants, but clearly its use in the joint trial did not raise even that degree of prejudice required to sever Peterson's trial under Rule 14, Fed.R. Crim.P.[28].

Eric Smith asserts that under the Federal Rules of Criminal Procedure, Rule 43, his absence at the "commencement"[29] of his trial left the District Court powerless to proceed against him. He makes no contention that his absence was involuntary, nor is he in a position to do so. He knew of his right to be present at trial, and was required to be there as a condition of his

hat by two eye-witnesses. Linda Smith's license tags were on the stolen getaway car parked behind the Peterson house. In the common areas of the Peterson home, the police found the disguises worn by the bank robbers, the bank money bags, the pillow cases used to transport the stolen loot, and over $160 in bank monies.

25. *United States v. Calandra, supra,* 414 U.S. at 348, 94 S.Ct. at 920.

26. *United States v. Calandra, supra,* 414 U.S. at 348, 94 S.Ct. at 620.

27. *See* note 6, *supra.*

28. *See Opper v. United States* (1954) 348 U.S. 84, 94–5, 75 S.Ct. 158, 99 L.Ed. 101; *United States v. Frazier* (4th Cir. 1968) 394 F.2d 258, 260–62, *cert. denied,* 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445 (1968); *Oden v. United States* (5th Cir. 1969) 410 F.2d 103, 104, *cert. denied,* 396 U.S. 863, 90 S.Ct. 138, 24 L.Ed.2d 116 (1969); *United States v. Kahn* (2d Cir. 1966) 366 F.2d 259, 263, *cert. denied,* 385 U.S.

948, 87 S.Ct. 321, 17 L.Ed.2d 226 (1966), *reh. denied,* 385 U.S. 984, 87 S.Ct. 502, 17 L.Ed.2d 445; *Rizzo v. United States* (8th Cir. 1962) 304 F.2d 810, 818, *cert. denied,* 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962).

Accordingly, Peterson's contention that the trial court abused its discretion in failing to grant a severance is without merit. Nor are two additional sources of alleged prejudice to Peterson sufficient to constitute an abuse of the trial court's discretion "to the point of contributing to an unfair trial or miscarriage of justice." *United States v. Frazier, supra,* 394 F.2d at 261.

29. Smith contends that the trial commences "at least" from the time the work of empaneling the jury begins. *Lewis v. United States* (1892) 146 U.S. 370, 373, 13 S.Ct. 136, 36 L.Ed. 1011; *Hopt v. Utah* (1884) 110 U.S. 574, 578–9, 4 S.Ct. 202, 28 L.Ed. 262. Our disposition of the issue on appeal makes irrelevant the precise point at which the trial begins.

bond. *See Stack v. Boyle* (1951) 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3. He was fully advised of the date, time and place of trial.[30] He offered no explanation for his absence at trial either at the time of sentencing before the District Judge or in his argument before us. Four times on the day prior to trial, Smith's counsel advised him of the importance of appearing in court the following day and even arranged to meet Smith an hour before trial to transport him to the court room. Despite the counsel's warnings and precautions to insure Smith's presence, Smith appeared neither at the appointed place nor at the court house. Neither the Court's nor his counsel's efforts to locate him bore fruit. Relying on *United States v. Tortora*,[31] the District Court elected to proceed with the trial in his absence. Smith remained at large until his arrest and sentencing several months subsequent to the completion of the trial. Thus Smith's sole claim is that Rule 43 establishes his presence at the commencement of the trial as an indispensable prerequisite to the proceedings. We disagree.

The linchpin of Smith's argument is the precise language of Rule 43, which provides in pertinent part:

> "The defendant shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by these rules.

In prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict. * * *."

Were we concerned only with a literal reading of the Rule, no doubt its language, as well as the language of the Advisory Committee's notes,[32] would lend some support to Smith's argument. Since, however, the rule is but a "restatement of existing law,"[33] the language upon which Smith relies must be construed in light of the prior law upon which the rule was founded and the "evolving meanings and purposes of the common law [right to presence]." *United States v. Gregorio* (4th Cir. 1974) 497 F.2d 1253, 1257, *cert. denied,* 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974).

Rule 43 represents no more than a "crystallization" of two earlier Supreme Court decisions applying the common law right of presence in federal criminal trials: *Lewis v. United States, supra,* 146 U.S. 370, 13 S.Ct. 136, and *Diaz v. United States* (1912) 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500.[34] While *Lewis* declares the general proposition incorporated in the first sentence of the rule, that "after indictment found, nothing shall be done in the absence of the prisoner," (146 U.S. at 372, 13 S.Ct. at 137), *Diaz* provided almost verbatim the exception embodied in the second sen-

---

**30.** Smith, together with counsel, had been personally present at arraignment and had entered a plea of not guilty on March 19, 1973. He was also present at the time of the execution of his surety bond on March 30, 1973, and at the pretrial suppression hearing held April 6, 1973, when his numerous pretrial motions were disposed of. At his arraignment, Smith had been informed that the trial was scheduled for May 1, 1973, and his bond, expressly noting the dates and times of his pretrial hearing and trial, was conditioned on his appearances thereat.

**31.** 464 F.2d 1202 (2d Cir. 1972), *cert. denied sub nom. Santoro v. United States,* 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972).

**32.** The notes of the Advisory Committee on the Rules states:

"The second sentence of the rule is a restatement of existing law that, except in capital cases, the defendant may not defeat the proceedings by voluntarily absenting himself after the trial has been commenced in his presence. *Diaz v. United States,* 223 U.S. 442, 455, 32 S.Ct. 250, 56 L.Ed. 500, Ann. Cas.1913C, 1138 * * *."

**33.** *See* note 32, *supra.*

**34.** *United States v. Gregorio, supra,* 497 F.2d at 1257. *See, also, Taylor v. United States* (1973) 414 U.S. 17, 20, 94 S.Ct. 194, 38 L.Ed.2d 174; *United States v. Tortora, supra,* 464 F.2d at 1208-10. *See generally* 8A Moore's Federal Practice ¶ 43.02[1] (2d ed. 1973); 3 Wright, Federal Practice and Procedure § 721 (1969).

tence of Rule 43.[35] It should be clear, poses of the common law" embodied in Rule 43. In *Gregorio, supra,*[37] we noted however, that no "talismanic properties" attach to the point at which the trial begins. *Government of Virgin Islands v. Brown* (3d Cir. 1975) 507 F.2d 186, 189. In speaking of a defendant's voluntary absence "after the trial has begun," the *Diaz* Court was referring merely to the factual context in which that particular defendant's voluntary waiver occurred— *i. e.,* after the commencement of his trial. Nothing in *Diaz* should be interpreted as precluding a court from continuing with a trial if the defendant voluntarily waives his presence before the trial commences. And this is so because the effect of the Philippine laws called into question in *Diaz*—laws which the Court stated were the "substantial equivalent" of the *Lewis* Sixth Amendment right to be present at one's own trial as "recognized and understood in this country"— made a defendant's presence " * * * indispensable at the arraignment, at the time the plea is taken, if it be one of guilt, and when judgment is pronounced, *and to entitle him to be present at all other stages of the proceedings, but not to make his presence thereat indispensable.*" [36] We therefore view as consistent with *Lewis* and *Diaz* an interpretation of Rule 43 permitting a defendant's voluntary absence at the commencement of his trial to act as a waiver of his rights to be present.

two reasons for the general common law right of presence in federal trials: (1) assuring a nondisruptive defendant the *opportunity* to observe all stages of the trial not involving purely legal matters so as to prevent the loss of confidence in courts as instruments of justice; and (2) guaranteeing the defendant the *opportunity* to aid in his defense so as to protect the integrity and reliability of the trial mechanism. So long as the defendant has been provided with *the opportunity to be present,* neither purpose is thwarted by a defendant's voluntary exercise of his option not to attend.[38] The very purpose of the exception embodied in *Diaz* and later adopted by the drafters of the Federal Rules, is to prevent an accused from defying with impunity "the processes of that law, * * * [paralyzing] the proceedings of courts and juries and * * * [turning] them into a solemn farce * * *." [39] To permit a defendant, free on bail, to obstruct the course of justice by absconding without a compelling reason, after having received actual notice of the time and place of trial, is as inconsistent with the purposes of the rule as to permit a defendant to abscond after the trial has commenced.[40] We therefore hold that a defendant may waive his right to be present at the commencement of his trial just as effectively as he can waive his right to be present at later stages of the proceedings.[41]

▪ Nor does our view conflict with the "evolving meanings and pur-

**35.** In the context of discussing the common law right to presence in federal trials, the *Diaz* Court stated (223 U.S. at 455, 32 S.Ct. at 254):

" * * * But, where the offense is not capital and the accused is not in custody, the prevailing rule has been, that if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present and leaves the court free to proceed with the trial in like manner and with like effect as if he were present."

**36.** 223 U.S. at 454, 459, 32 S.Ct. at 253 (emphasis added).

**37.** 497 F.2d at 1258–59.

**38.** *United States v. Tortora, supra,* 464 F.2d at 1209. See, also, *Taylor v. United States, supra,* 414 U.S. at 19–20, 94 S.Ct. 194.

**39.** *Falk v. United States,* 15 App.D.C 446, 460 (1899), *appeal dismissed,* 180 U.S. 636, 21 S.Ct. 922, 45 L.Ed. 709, *cert. denied,* 181 U.S. 618, 21 S.Ct. 922, 45 L.Ed. 1030 (1901), quoted in *Diaz, supra,* 223 U.S. at 458, 32 S.Ct. at 255.

**40.** *Government of Virgin Islands v. Brown, supra,* 507 F.2d at 189–90; *United States v. Tortora, supra,* 464 F.2d at 1209. *Cf. Illinois v. Allen* (1970) 397 U.S. 337, 342, 90 S.Ct. 1057, 25 L.Ed.2d 353, *reh. denied,* 398 U.S. 915, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970).

**41.** Of course, a waiver of the right to be present under Rule 43 must be knowing and voluntary. But "[T]he right at issue is the

In so interpreting Rule 43, we join with two Circuits which have already confronted the same issue, and, in our opinion, reached the correct result: *Government of Virgin Islands v. Brown* (3d Cir. 1975) 507 F.2d 186, and *United States v. Tortora* (2d Cir. 1972) 464 F.2d 1202.[42] Normally it is preferable for a defendant to be present at his trial, but we recognize, as did Judge Lumbard in *Tortora,* that our holding does not establish "a general rule that, in every case in which the defendant is voluntarily absent at the empanelment of the jury * * *, the trial judge should proceed with the trial." Indeed, not every case involving a defendant's voluntary absence at the commencement of the trial is a proper one in which to proceed to trial *in absentia. See, e. g., Campbell v. United States* (D.C.App. 1972) 295 A.2d 498.[43] Instead, each case turns upon "a complex of issues," including "the likelihood that the trial could soon take place with the defendant present; the difficulty of rescheduling, particularly in multiple-defendant trials;

the burden on the Government in having to undertake two trials, again particularly in multiple-defendant trials where the evidence against the defendants is often overlapping and more than one trial might keep the Government's witnesses in substantial jeopardy."[44] Thus the decision whether to proceed to trial is vested in the sound discretion of the trial judge. Within the circumstances of this case, we are convinced that the District Judge did not abuse his discretion in electing to proceed with the trial in Smith's absence.

A similar set of extraordinary factors as those found in *Tortora* are present here. Smith was jointly indicted with five other defendants, each of whom was present and prepared for trial. After conferring with Smith's counsel, it became apparent to the trial judge that Smith had no intention of appearing and that he had fled to escape prosecution, forfeiting his $25,000 bond. The likelihood of his speedy return was remote. Over twenty government witnesses had been assembled, most of whom were to

right to be present," not the right to have the trial proceed only in the defendant's presence. *Taylor v. United States, supra,* 414 U.S. at 20, 94 S.Ct. at 196, *affirming,* 478 F.2d 689 (1st Cir. 1973). Thus, if a defendant is aware of the processes occurring and of his right and obligation to be present, his voluntary absence without compelling justification establishes an effective waiver. *Taylor, supra,* 414 U.S. at 19–20, n. 3, 94 S.Ct. 194; *Government of Virgin Islands v. Brown, supra,* 507 F.2d at 189; *United States v. Tortora, supra,* 464 F.2d at 1209. *See also State v. Davis* (1972) 108 Ariz. 335, 498 P.2d 202, 203–04.

**42.** *See, also, State v. Tacon* (1971) 107 Ariz. 353, 448 P.2d 973, *cert. granted,* 407 U.S. 909, 92 S.Ct. 2446, 32 L.Ed.2d 682 (1972), *cert. dismissed as improvidently granted,* 410 U.S. 351, 93 S.Ct. 998, 35 L.Ed.2d 346 (1973).

**43.** Even Judge Lumbard conceded that it would be difficult "to conceive of any case * * * other than a multiple-defendant case" that would present circumstances justifying the trial court's election to proceed to trial in the absence of the accused. *Tortora, supra,* 464 F.2d at 1210, n. 7. *Campbell* provides an excellent example of just such a case. The District of Columbia Court of Appeals had originally reversed the accused's single-count conviction for possession of heroin on the grounds that the trial judge had "commenced" the trial in the absence of the defendant. The

operative rule in the District of Columbia was the verbatim equivalent of Rule 43, Fed.R. Crim.P. But the *Campbell* decision had been made without the benefit of Judge Lumbard's decision in *Tortora.* Primarily on the basis of that case, the Government petitioned for a rehearing. Although ultimately upholding its original reversal of the conviction, the Court reconciled its *ratio decidendi* with that of *Tortora:*

"* * * Unlike *Tortora,* this case began with a single-count information charging possession of heroin. It took less than two months for the case to reach trial, and the trial, including the *Miranda* hearing, took less than a day. Aside from the chemist, the only witnesses were two arresting officers. *In short, no extraordinary circumstances such as found in* Tortora *are present here. We agree with the opinion by Judge Lumbard that the judgment to proceed with jury selection without the accused should be undertaken 'only when the public interest clearly outweighs that of the voluntary absent defendant.' * * * To be sure, there may be complex and difficult cases where, on facts like these, it would not be inappropriate to proceed without an accused being present, but this case cannot be viewed as one of them."* 295 A.2d at 502–03 (emphasis added).

**44.** 464 F.2d at 1210.

give crucial identification testimony. A lengthy delay occasioned by a continuance would surely have prejudiced the Government's case against all the defendants. Although no threats had been made against the witnesses as in *Tortora,* Nina Butler, the Government's chief witness and potential accomplice in the crime, had already proved recalcitrant. At the earlier suppression hearing, she had failed to respond to a subpoena to testify and had eluded the police until shortly before the trial date. Delay would have provided her with an additional opportunity to abscond. Thus the burden on the Government in having to undertake two trials involving the same witnesses and proof, or alternatively, the substantial risk that delay might prejudice the Government's entire case if a continuance were granted, clearly outweighed the interests of the voluntarily absent defendant.

We have thoroughly considered the appellants' other claims of error and find them to be without merit. Accordingly, we affirm the judgments of conviction of all the appellants.

Affirmed.